Harvey SEIDENSTEIN, M.D., and Harvey Seidenstein, P.A., A Professional Association, d/b/a Drs. Seidenstein and Didonna, P.A., Plaintiffs-Appellees Cross-Appellants,

v.

NATIONAL MEDICAL ENTERPRISES, INC., and National Medical Hospital of Texas, Inc., d/b/a Sierra Medical Center, Defendants-Appellants Cross-Appellees,

Herbert McDonald, M.D., John Hill, M.D. and Joe Kidd, M.D., Defendants Cross-Appellees.

No. 83–1792.

United States Court of Appeals, Fifth Circuit.

Sept. 3, 1985.

Richard Munzinger, Stuart R. Schwartz, El Paso, for all defendants-appellants cross-appellees.

Brice A. Tondre, Wheat Ridge, Colo., Malcolm McGregor, El Paso, Tex., for plaintiffs-appellees cross-appellants.

Before GEE, WILLIAMS and JOLLY, Circuit Judges.

GEE, Circuit Judge:

This appeal arises from the suspension of Dr. Harvey Seidenstein's medical staff privileges at Sierra Medical Center, a private hospital in El Paso, Texas. Texas law governs the major issue, one of defamation.

*Facts and Procedural History*

Sierra Medical Center (Sierra) is one of five hospitals in El Paso offering invasive cardiology and open heart surgery; it is owned by National Medical Enterprises (NME), a California corporation. Dr. Edward Egbert is chairman of Sierra's governing board and a director of NME. Dr. John Hill and Dr. Herbert McDonald are invasive cardiologists. Hill is a member of Sierra's governing board and McDonald is its director of cardiology. Dr. Joe Kidd is a cardiovascular surgeon whose primary practice of open heart surgery is conducted for the most part at Sierra. Dr. Harvey Seidenstein is also an invasive cardiologist. In 1978 he had staff privileges at seven El

Paso hospitals including Sierra, although he had never used Sierra's facilities.

Dr. Seidenstein told Dr. Egbert in August 1978 that he intended to exercise his Sierra staff privileges. Sierra's cardiology department was not happy when it heard the news of Dr. Seidenstein's impending arrival. In the years preceding his announcement, Dr. Seidenstein had managed to alienate a goodly portion of the El Paso cardiological community; his conduct had scarcely been such as to engender much personal affection. The record relates how Dr. Seidenstein was accustomed to "giving the Bird" to others in the operating room, and how he called Dr. Crossett "a senile old butcher," Dr. Kern "incompetent," Dr. Iwen "utterly incompetent," Dr. Coldwell "an idiot," Dr. Egbert "dumb," Dr. Hill "a faggot," Dr. Kidd "unethical," and the Sierra board "a bunch of incompetent obstetricians, incompetent internists, and lesser qualified GPs." Dr. Seidenstein endeared himself to his nurse-technician, a Mexican-American, by commenting that his female Mexican-American patients should be over-radiated to prevent them from having babies who would grow up to be on welfare, and that Dr. Velez, a Mexican-American cardiologist, was incompetent and should be sent back to South America by the Border Patrol. With similar tact, Dr. Seidenstein told Dr. Kidd's surgical nurse that it was unnecessary for her to prepare post-operative orders for Dr. Kidd's patients because "none of [them] would make it that far anyway." As Dr. Kidd emerged from the operating room after performing surgery to repair a congenital heart defect, Dr. Seidenstein remarked to the director of the Providence cardiac catheterization lab (hereafter cath lab) that "these kinds of cases shouldn't be done in El Paso; they should be sent to Houston to be done by a trained surgeon." Dr. Seidenstein further strained his relationship with local cardiologists by interposing non-existent cases and feigned emergencies to block others from use of the Providence cath lab.

Such incidents aroused strong feelings, sufficiently so that members of Sierra's cardiology department threatened to quit if Seidenstein began to practice there. Sierra's Executive Committee met to discuss the situation; at the meeting, witnesses recounted incidents like those detailed above to explain their refusal to work with Dr. Seidenstein. The Committee voted to suspend Dr. Seidenstein's privileges at the hospital immediately. Dr. Seidenstein was informed by letter dated October 11, 1978, of the charges on which his suspension had been based; the letter read as follows:

> The governing body of Sierra Medical Center charges that you have demonstrated an inability to work harmoniously with others. You are charged with an inability to cooperate with personnel of this hospital, of making slanderous and derogatory statements about the hospital itself, its governing body, medical staff, corporate owner and administration. The governing body of Sierra Medical Center determined that summary suspension of your clinical privileges was in the best interest of patient care at Sierra Medical Center. The cardiology program at this hospital is essential if the hospital is to maintain the quality of patient care for which it strives. Cooperation and congenial working relationships between cardiologists and surgeons, lab technicians, nurses and other hospital personnel is essential. You have wrongfully maligned and questioned the abilities of cardiologists and surgeons on the staff of this hospital. You have attempted to monopolize laboratories at other hospitals where you have practiced, making it difficult, if not impossible, for other cardiologists to practice with you. You are charged with having "banked" hospital laboratories for extended periods of time thereby preventing other cardiologists from using laboratory procedures. In these instances, patients have not appeared and tests have not been made even though laboratory schedules appear to have been full. You have indicated a desire to control hospital laboratories and have instructed lab technicians not to schedule patients of other physicians and to inform other physicians that the tech-

nicians are unable to assist in performing certain tests, when such was not the case. You are charged with "bumping" patients of other physicians by claiming the existence of a medical emergency which would justify such action, when, in fact, no such emergency existed.

You are charged with viciously and unnecessarily questioning the competence of other physicians. You have demonstrated an inability to work within the prescribed rules and regulations at hospitals, including William Beaumont Army Medical Center and Providence Memorial Hospital.

Seidenstein appealed his suspension to a Judicial Review Committee. The Committee held a hearing, lasting thirteen hours, at which many witnesses, including McDonald, Hill, and Kidd, testified. At some point after the suspension but before the Committee announced its final decision, Dr. Egbert said to a group of Sierra doctors that the reasons for Dr. Seidenstein's suspension "were of such a grave ethical and moral nature that they could not be disclosed."

On November 21, 1978, the Judicial Review Committee affirmed Dr. Seidenstein's suspension; it concluded that he had "demonstrated a pattern of behavior which has gone on for a decade and which the Board felt could be anticipated to continue." Dr. Seidenstein responded to his suspension and Dr. Egbert's remark by bringing this action against Hill, Kidd, McDonald, Sierra and NME, alleging violations of Sections 1 and 2 of the Sherman Act, denial of due process and equal protection under the United States and Texas constitutions, violations of §§ 1983 and 1985, violations of federal Medicare and Medicaid regulations, tortious interferences with business relationships, deceptive trade practices, trade disparagement, libel, and slander.

Before trial the district court granted defendants' motions to dismiss and for partial summary judgment on all but the Sherman Act, tortious interference, and defamation claims. At the close of the evidence, the court granted defendants' mo-tion for a directed verdict as to Dr. Seidenstein's claims of libel and conspiracy to monopolize, attempted monopolization, and monopolization under section 2 of the Sherman Act, found Dr. Egbert's remark, the alleged slander, to have been uttered on a conditionally privileged occasion, and submitted the remaining case to the jury on 23 special interrogatories.

The jury found that defendants neither violated section 1 of the Sherman Act nor tortiously interfered with Dr. Seidenstein's business relationships. It did find for Seidenstein on his slander claim and set damages at $625,000. Defendants filed motions for judgment notwithstanding the verdict and for partial new trial, which were denied; judgment was entered for Seidenstein. His motions for new trial and for entry of mandatory injunction were also denied. Defendants appealed, and Dr. Seidenstein cross-appealed.

### "Actual Malice"

■ Dr. Egbert made the statement at issue here—that the reasons for Dr. Seidenstein's suspension "were of such a grave ethical and moral nature that they could not be disclosed"—to a group of Sierra doctors. Dr. Egbert and the doctors shared a common, and legitimate, interest in the suspension; Dr. Egbert's remark was thus protected by the conditional privilege granted under Texas law to "statements which occur under circumstances wherein any one of several persons having a common interest in a particular subject matter may reasonably believe that facts exist which another, sharing that common interest, is entitled to know." *Gaines v. CUNA Mutual Insurance Society*, 681 F.2d 982, 986 (5th Cir.1982), *quoting McDowell v. Texas*, 465 F.2d 1342, 1344–45 (5th Cir.1971), *cert. denied*, 410 U.S. 943, 93 S.Ct. 1371, 35 L.Ed.2d 610 (1973); *see Dixon v. Southwestern Bell Telephone Co.*, 607 S.W.2d 240, 242 (Tex.1980); *Dun & Bradstreet, Inc. v. O'Neil*, 456 S.W.2d 896 (Tex.1970). The trial court's finding of conditional privilege is not disputed, nor is it disputed that Texas law requires a showing

of actual malice to overcome conditional privilege. *Golden Bear Distributing Systems v. Chase Revel, Inc.,* 708 F.2d 944, 948 (5th Cir.1983); *Dixon,* 607 S.W.2d at 242; *Dun,* 456 S.W.2d at 900; *Ryder Truck Rentals, Inc. v. Latham,* 593 S.W.2d 334, 339–40 (Tex.Civ.App.—El Paso 1979, writ ref'd n.r.e.).

Texas defamation law applies the same definition of "actual malice" as the constitutional one defined by federal courts. As we held in *Golden Bear, supra,* at 948:

> If the subject of the libel is a public figure or the publisher has a qualified privilege with respect to the subject or matter in contention, then the injured party must show actual malice, defined as in the constitutional standard as knowledge of falsity or reckless disregard. *Dun & Bradstreet, Inc. v. O'Neil,* 456 S.W.2d 896, 900 (Tex.1970); *British Overseas Airways Corp. v. Tours & Travel of Houston, Inc.,* 568 S.W.2d 888, 893 (Tex.Civ.App.—Houston 1978, writ ref'd n.r.e.).

"Reckless disregard" requires proof that a false defamatory statement was made with a "high degree of awareness of [its] probable falsity." *Garrison v. Louisiana,* 379 U.S. 64, 74, 85 S.Ct. 209, 215, 13 L.Ed.2d 125 (1964). There must be sufficient evidence to conclude that the defendant in fact entertained "serious doubts" as to the truth of the publication. *St. Amant v. Thompson,* 390 U.S. 727, 731, 88 S.Ct. 1323, 1325, 20 L.Ed.2d 262 (1968).

*Fosier v. Upchurch,* 624 S.W.2d 564, 566 (Tex.1981).

The standard is thus a subjective one, calling Dr. Egbert's state of mind into question ("high degree of awareness," "serious doubts"). Proof of falsity in fact is not enough, nor is proof of a combination of falsehood and general hostility. *Greenbelt Cooperative Publishing Association v. Bresler,* 398 U.S. 6, 10, 90 S.Ct. 1537, 1539, 26 L.Ed.2d 6 (1970) ("the jury was permitted to find liability merely on the basis of falsehood and general hostility. This was error of constitutional magnitude, as our decisions have made clear"); *Rebozo v. Washington Post Co.,* 637 F.2d 375 at 380 (5th Cir.1981). Nor can "malice ... be inferred from the character of the language used, if privileged, without *other evidence* to prove it...." *Fitzjarrald v. Panhandle Pub. Co.,* 149 Tex. 87, 228 S.W.2d 499, 505 (1950) (emphasis added), *quoted in Golden Bear, supra,* at 950. Appellants contend that this standard was not met here; they argue that the jury finding of "actual malice" was unsupported by the requisite evidence of "subjective awareness of probable falsity." *Rosanova v. Playboy Enterprises, Inc.,* 580 F.2d 859, 862 (5th Cir.1978); *St. Amant,* 390 U.S. at 731, 88 S.Ct. at 1325.

The trial record in this case encompasses almost 4,000 pages of testimony contained in fifteen volumes. Dr. Seidenstein's first witness on the first day of trial was Dr. Egbert; Egbert testified to making the statement at issue. Asked by defendants' counsel on cross-examination whether he believed Seidenstein to have done anything immoral, Egbert answered that he did so believe. Despite the obvious importance to Siedenstein's case of establishing that Egbert did *not* in fact so believe, this assertion by Egbert was not questioned by plaintiff's counsel; the matter was never again raised. No other witness called by Dr. Seidenstein so much as mentioned Dr. Egbert's statement. Indeed, when counsel for defendants attempted to cross-examine one of Dr. Seidenstein's witnesses as to Dr. Egbert's truthfulness, plaintiff's counsel objected on the ground that he "knew of nothing yet that would bring that into issue."

To the contrary, it is difficult to imagine anything more fundamentally at issue than Dr. Egbert's truthfulness in an action governed, as was this one, by the definitions of "actual malice" quoted above; Dr. Seidenstein can scarcely have expected to prove that Dr. Egbert spoke with knowledge that his statement was false or with reckless disregard for whether it was false or not without questioning Egbert's truthfulness.

*See Frank B. Hall & Co. v. Buck,* 678 S.W.2d 612, 621 (Tex.App.—Houston 1984). The fact, however, is that he did not do so; Dr. Seidenstein closed his case without a single additional reference to Dr. Egbert's words and without presenting a shred of evidence as to Egbert's state of mind when he uttered them. In sum, of the 2400 pages of testimony presented by Seidenstein, exactly five dealt with Dr. Egbert's alleged slander.

Thus, the only direct evidence of Dr. Egbert's state of mind was that provided by Egbert himself. It is of course true that neither we nor the jury are obliged to believe him; however, it is familiar and general law that "discredited testimony is not considered a sufficient basis for drawing a contrary conclusion." *Bose,* 466 U.S. at ——, 104 S.Ct. at 1966, 80 L.Ed.2d at 524. It is also true that actual malice may be proved inferentially, *Liberty Lobby, Inc. v. Anderson,* 746 F.2d 1563, 1569 (D.C.Cir. 1984), *cert. granted in part,* —— U.S. ——, 105 S.Ct. 2672, 86 L.Ed.2d 291 (1985); *Stearns v. McManis,* 543 S.W.2d 659, 664 (Tex.Civ.App.—Houston 1976, writ dismissed). The Supreme Court has stated that "[p]rofessions of good faith will be unlikely to prove persuasive, for example, where a story is fabricated by the defendant, is the product of his imagination, or is based wholly on an unverified anonymous telephone call. Nor will they be likely to prevail when the publisher's allegations are so inherently improbable that only a reckless man would have put them in circulation." *St. Amant,* 390 U.S. at 732, 88 S.Ct. at 1326. None of these circumstances is present here. Dr. Seidenstein was guilty of many extremely unpleasant acts. There was testimony, undisputed by Seidenstein, that he had accused many of his colleagues of incompetence and of causing the deaths of their patients. He had expressed racist feelings in the most extreme statements. It does not stretch matters to call such statements unethical or immoral.

In order to carry his burden of proof on the issue of actual malice, Dr. Seidenstein was required to produce evidence showing or tending to show that Dr. Egbert did not consider Seidenstein's racial and professional slurs, obscene gestures, and dishonest manipulation of hospital facilities to be matters of grave ethical and moral concern. Dr. Seidenstein produced no such evidence. Moreover, given the undisputed evidence in the record of conduct by Dr. Seidenstein that could reasonably be characterized as unethical or immoral, it is far from clear that Seidenstein proved Egbert's statement to be false. *See Garrison v. Louisiana,* 379 U.S. 64, 74, 85 S.Ct. 209, 215, 13 L.Ed.2d 125 (1964); *Betancourt v. Whittle,* 659 S.W.2d 895, 897 (Tex.Civ.App.—San Antonio 1983, no writ); *A.H. Belo Corp. v. Rayzor,* 644 S.W.2d 71, 78–79 (Tex.App.—Ft. Worth 1982, writ ref'd n.r.e.). Evidence that Dr. Egbert "in fact entertained serious doubts as to the truth of his publication," *St. Amant,* 390 U.S. at 731, 88 S.Ct. at 1325, cannot be found in a record that causes us to entertain serious doubts as to its falsity. Accordingly, because we find no evidence that Dr. Egbert did not believe that what he said was true, we hold that "actual malice" was not proved here.

*Section 2 Sherman Monopolization*

Dr. Seidenstein's second amended complaint alleged that the defendants conspired to monopolize or attempted to monopolize invasive cardiology at Sierra, in violation of Sherman Act § 2, 15 U.S.C. § 2. At the close of the evidence, the district court directed a verdict for defendants on this claim on grounds that the relevant product market included invasive cardiology services provided at all the hospitals in El Paso, and not just the services at Sierra. Dr. Seidenstein appeals from this action.

■ Section 2 of the Sherman Act prohibits the monopolization or attempted monopolization of any part of interstate trade or commerce. 15 U.S.C. § 2. Monopoly power is "the power to control price or exclude competition." *United States v. E.I. du Pont de Nemours & Co.,* 351 U.S. 377, 391, 76 S.Ct. 994, 1005, 100 L.Ed. 1264 (1956). To prove monopolization, the plain-

tiff must demonstrate that the defendant had both the capacity and the intent to monopolize. The Supreme Court defined the two elements of establishing monopoly in *United States v. Grinnell Corp.*, 384 U.S. 563, 570–71, 86 S.Ct. 1698, 1703–04, 16 L.Ed.2d 778 (1966): "(1) the possession of monopoly power in the relevant market and (2) the willful acquisition or maintenance of that power as distinguished from growth or development as a consequence of a superior product, business acumen, or historic accident."

▮ Before a defendant's market power can be determined, the relevant market must be defined.[1] This question is usually one of fact for the jury. *Domed Stadium Hotel, Inc. v. Holiday Inns, Inc.*, 732 F.2d 480, 487 (5th Cir.1984). In some instances, however, the relevant market may be determined as a matter of law, as this Court decided in *Domed Stadium.* In that case, summary judgment was granted for the defendant on a Sherman § 2 monopolization claim. The plaintiff in *Domed Stadium* argued that the relevant market comprised only hotel rooms in the defendant hotel as opposed to hotel rooms in the entire city of New Orleans. Plaintiff argued that the defendant therefore had

100% of the relevant product market. We rejected the argument and found hotel rooms throughout the city rather than hotel rooms at the Holiday Inn to be the relevant market. As the court explained, absent exceptional market conditions, one brand in a market of competing brands cannot constitute a relevant product market. *Id.* at 488.

▮ Similarly in this action, Dr. Seidenstein argued that the relevant market was invasive cardiology at Sierra Medical Center and that the defendants controlled 100% of that market. However, no evidence was presented to suggest that Sierra is recognized as a separate and distinct market, or that unique services or facilities existed there. Sierra is only one of five hospitals offering invasive cardiology services in El Paso, and Dr. Seidenstein offered no proof that the defendants possessed monopoly power within the city of El Paso. We therefore hold that the district court's grant of a directed verdict on the Sherman § 2 claim was proper.[2]

We have carefully examined the record and find no merit in the remaining claims or cross-claims.

---

1. The controversy here involves definition of the relevant product market only. The parties do not dispute that the city of El Paso is the relevant geographical market.

2. This determination of what constitutes the relevant market is supported by the recent Supreme Court decision in *Jefferson Parish Hospital District No. 2 v. Hyde*, 466 U.S. 2, 104 S.Ct. 1551, 80 L.Ed.2d 2 (1984). *Jefferson Parish* involved a Sherman § 1 claim that was brought by an anesthesiologist who was denied admission to the hospital's medical staff because the hospital had entered into an exclusive contract with a firm, one requiring that all services related to anesthetization for the hospital be performed by that firm. The district court found no Sherman § 1 violation, but was reversed by this Court, holding that the exclusive contract constituted a tying arrangement that was illegal *per se.* The Supreme Court reversed.

   One of the elements of proving that a tying arrangement is illegal *per se* is a demonstration that there is sufficient market power in the tying market to coerce consumers to purchase the tied product. Before market power in the tying market can be determined, the relevant

   market must first be defined. In concluding that the defendant in *Jefferson Parish* had a dominant market position, this Court held that the defendant hospital constituted the relevant market, and that persons residing near the hospital and who were in need of hospital services would be forced to purchase the tied services. The Supreme Court held, however, that the relevant market included the other hospitals in Jefferson Parish, and that market dominance was not established by the mere fact that many patients chose the hospital closest to them as a matter of convenience. In other words, preference for convenience was not to be construed as coercion to purchase the tied services.

   Similarly in a Sherman § 2 monopoly claim, market power is dependent on the definition of the relevant market. The fact that more individuals may prefer Sierra to other hospitals offering similar services does not mean that Sierra should be viewed as a separate market. Its market power must be determined in relation to all five hospitals in El Paso offering invasive cardiology services.

*Conclusion*

For the reasons set forth above, we reverse the trial court's judgment for Seidenstein on his slander claim and remand the cause to the district court for entry of judgment for appellants on that claim.[3] The trial court's judgment is affirmed in all other respects.

AFFIRMED in part, REVERSED in part, and REMANDED.

JERRE S. WILLIAMS, Circuit Judge, dissenting:

The opinion for the Court by my brother Gee sets up an intricately reasoned obstacle course to the recovery by Dr. Seidenstein for a blatant and malicious slander. The technical detail in the reasoning of the majority opinion results in a smoke screen over what actually is at issue in this case.

## I.

To make my position clear, I emphasize two fundamental points. The first consists of the critical facts and the second is the critical legal posture. As to the facts, the jury extracted what happened from the confusion of witness testimony which often appears in transcripts and which the majority opinion emphasizes. What happened in this case was that Dr. Seidenstein was summarily suspended from medical staff privileges at the Sierra Medical Center in El Paso, Texas. He was charged by the Sierra facility with strong and sarcastic criticism of the abilities and qualifications of fellow physicians, inability to work with physicians and other medical personnel, and an abrasive personality. The particular charges were not generally known to the staff of the Sierra Hospital.

Dr. Seidenstein's suspension from the right to practice at the hospital occasioned interest among the hospital staff. At a staff meeting or board meeting attended by perhaps as many as 75 of Dr. Seidenstein's peers, Dr. Egbert, the principal stockholder and a director of the corporation which owns and operates the Sierra Hospital, was asked what were the reasons for the suspension. If Dr. Egbert had at that time given the actual reasons for the suspension, as set out above and in Judge Gee's opinion, there would be no case. Instead, however, Dr. Egbert replied with a malicious slander. He said that the reasons for Dr. Seidenstein's summary suspension "were of such grave, ethical, and moral nature that you could not even tell the staff what they were."

Second, as to the legal issues, I urge that the issue before us is whether there is sufficient evidence to uphold a jury verdict. Appellee Seidenstein has a jury verdict in his favor.

The case which controls Seidenstein's case constitutionally is *Gertz v. Robert Welch, Inc.,* 418 U.S. 323, 94 S.Ct. 2997, 41 L.Ed.2d 789 (1974), which holds that the Constitution does not require proof of actual malice in a defamation case involving citizens who are not public officials or public figures. That disposes of any constitutional issue concerning a requirement of the proof of actual malice.

Actual malice did have to be proved in this case, however, but only because the law of the State of Texas required it. It is not disputed that Dr. Egbert's comment was entitled to a conditional privilege under state law because the statement occurred "under circumstances wherein any one of several persons having a common interest in the particular subject matter may reasonably believe that facts exist which another, sharing that common interest, is entitled to know." *Gaines v. CUNA Mutual Ins. Society,* 681 F.2d 982, 986 (5th Cir.1982); *Dun & Bradstreet, Inc. v. O'Neil,* 456 S.W.2d 896 (Tex.1970). To hold someone liable under Texas law when the statement is so conditionally privileged requires a showing of actual malice. *Golden Bear Distributing Systems v. Chase Revel, Inc.,* 708 F.2d 944, 949 (5th Cir.1983); *Dun & Bradstreet,* 456 S.W.2d at 898.

---

**3.** In view of this holding, we need not address the parties' assignments of error involving the trial court's evidentiary rulings, damages, and the liability of NME.

*New York Times v. Sullivan,* 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964), comes into this case without constitutional compulsion. Texas has adopted the *New York Times v. Sullivan* standard for the proof of actual malice as the standard under Texas law to prove actual malice to overcome the conditional privilege. Under this standard the jury in the instant case was correctly charged that "a statement is made 'with actual malice' when the author either (a) knows the matter stated therein to be false, or (b) acts in reckless disregard as to its truth or falsity." This is the standard in Texas, *Golden Bear Distr. Systems,* 708 F.2d at 948; *Dun & Bradstreet,* 456 S.W.2d at 900.

Carrying the issue one step further, there is no Texas statutory or case law which adopts the rule of *Bose Corp. v. Consumers Union of the United States, Inc.,* 466 U.S. 485, 104 S.Ct. 1949, 80 L.Ed.2d 502 (1984), that a jury finding of actual malice must be reviewed by the appellate court on a *de novo* basis. The great deference toward jury verdicts for which the State of Texas is well-known raises considerable doubt that Texas would require a *de novo* review of the findings of a jury as to actual malice in a case, such as this, where the Constitution does not require a finding of actual malice and does not require *de novo* appellate review. I think it highly unlikely that the State of Texas, although it adopts the substantive aspects of *New York Times v. Sullivan* for the proof of actual malice, would adopt the *Bose* rule in a nonconstitutional case involving a private citizen and require *de novo* appellate review of a jury verdict finding actual malice. In my opinion, the case before us is properly disposed of on the usual basis of inquiring whether there is substantial evidence to support the jury verdict, and the majority opinion does so.

## II.

It is in the defamatory nature of the statement at issue that I find myself most completely at odds with the opinion of my brother Gee. He finds that Dr. Egbert on the record believed the critical statement was a true statement. The thrust of the opinion for the Court puts Dr. Seidenstein on trial rather than Dr. Egbert. The jury heard all of the testimony covering all of Dr. Seidenstein's professional lifetime concerning his criticism of other physicians and their professional abilities, racial slurs, abrasiveness, and the like. This is the testimony which is presented in full detail up front in the opinion of the Court and then gone over again later. The jury was at liberty to disbelieve or discount this testimony concerning a doctor respected in the community and whom Dr. Egbert himself considered as a competent associate right up to the time of these events. I freely concede that the record shows that Dr. Seidenstein is abrasive and from time to time has been personally and professionally critical of other physicians and medical personnel. Indeed, as I indicated earlier, if that is what Dr. Egbert candidly had given as the reason he was being suspended from the Sierra Hospital staff there would be no case at all.

But the intricacies of the majority opinion cloud the core of the case. What professional person could possibly feel that he or she or a colleague had not been defamed if a fellow member of the profession speaking to other fellow members of the profession reported that he or she had been deprived of some official status related to the profession for reasons which "were of such grave, ethical, and moral nature that you could not even tell the staff what they were?"! It is my view that these words are defamatory and constitute slander on their face. And this would be so whether they were said by an assembly line worker to fellow assembly line workers about an assembly line worker, whether they were said by a skilled craftsman to other skilled craftsmen about a skilled craftsman, whether they were said by a doctor or lawyer to other doctors or lawyers about a doctor or lawyer, or even whether they were said by one federal judge to a group of federal judges about another federal judge. The implication of the statement was shocking and grossly misleading.

Mere visualization of the circumstances of the case and the impact upon the defamed is enough. If this was not patent defamation, there is a black hole in the law which should be corrected and corrected immediately.

And then Dr. Egbert compounded the defamation in evidence which the majority opinion does not report by explicitly disclaiming that he was "implying anything irregular about Dr. Seidenstein's medical practice." This clearly made the implication that the grave, ethical, and moral nature of Dr. Seidenstein's character defects were personal to him and were such that no other physician should be associating with him as a person. It meant that the impact of these words could not be glossed over by assuming they were referring to alcohol abuse or certain business practices or even racial slurs which were not humorous or were unacceptable humor. Any of these matters could be reported to a staff absent a highly abnormal sense of delicacy. The implication is inescapable that the words and the later limitation implied some serious and socially unacceptable offense or defect of character such as narcotics addiction, child molesting, fraud or dishonesty, homosexuality, wife beating, or the like.

Finally, this was a statement by a physician to a group of physicians about a fellow physician. Under Texas law if the words are not slanderous on their face, there must be proof that the words were understood by a listener as being defamatory. *Reicheneder v. Skaggs Drug Center*, 421 F.2d 307, 311 (5th Cir.1970); *Bergman v. Oshman's Sporting Goods, Inc.*, 594 S.W.2d 814, 815 (Tex.Civ.App.1980, no writ). Under Texas law, however, if the statement is slanderous per se it is only necessary to prove that the words were heard by a third person. As a matter of law it is presumed that language which is slanderous per se so obviously imparts defamatory meaning that no proof of a third person's subjective understanding of the words is required. "Utterances are slanderous per se if they are false, made without privilege, and ascribed to another con-

duct, characteristics, or conditions incompatible with the proper conduct of his lawful profession or office." *McDowell v. State of Texas*, 465 F.2d 1342, 1344 (5th Cir.1971), *cert. denied*, 410 U.S. 943, 93 S.Ct. 1371, 35 L.Ed.2d 610 (1973) (en banc); *Braugh v. Enyart*, 658 S.W.2d 221, 226 (Tex.App. 1983, writ ref'd n.r.e.). I have not the slightest doubt that under Texas law this shocking and deplorable statement was slanderous per se.

There remains only the question of whether the record supports the jury verdict that the statement was made with malice on the part of Dr. Egbert. Under the alternative definition of malice contained in *New York Times v. Sullivan* and applicable to this case the jury found that it was, and this record supports it. It is not required that the person committing the defamation know that the matter stated is false but only that he or she "acts in reckless disregard as to its truth or falsity." The facts were available to Dr. Egbert. He knew what they were. He could have read to the assembled doctors the official charge against Dr. Seidenstein, or he could have summarized it. But the jury could find that the innuendo went far beyond any good faith attempt to deal with the suspension of Dr. Seidenstein. I find, just as the jury did, that malice is proved in this record by the statement itself, particularly because of the implication that the matters were so grave that staff members could not even be told about them in the setting and context of the action which had been taken. I must dissent from a conclusion that a person in a position of power and authority in a prestigious profession does not run afoul of the law when he recklessly makes such an innuendo-laden factually false statement to fellow physicians about a physician colleague. Defamation was established and malice was established.

This Court takes away from plaintiff a jury verdict which on its face has sufficient evidence to support it. We have no authority to do this. "This Court affords great deference to jury findings.... The most an appellate court can do is to determine

whether there was any competent and substantial evidence in the record which fairly tends to support the verdict." *Wood v. Diamond M Drilling Co.,* 691 F.2d 1165 (5th Cir.1982). The statement itself in its context and with its innuendos and the additional clarifying statement compounding the slander clearly meet this requirement. I dissent strongly from the conclusion of the majority of the panel.

I am in full agreement with the Court upholding the district court's directed verdict against the Sherman § 2 antitrust claim. I would also set aside the award of $650,000 damages because it was inextricably interwoven with damages claimed for the loss of business resulting from his suspension from the hospital. There was nothing illegal about the suspension. The result is that it is my view the case should be returned for a determination of damages based solely upon the defamation.

The law provides a remedy by way of recovery of damages for defamation for the physician stigmatized and debased in the attack upon personal moral character which occurred in this case. I must dissent from the conclusion that this citizen is without remedy for that wrong.