IN THE UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT

_____

No. 98-21007
_____


UNIVERSAL COMPUTER SYSTEMS, INC.;
UNIVERSAL COMPUTER SERVICES, INC.;
UNIVERSAL COMPUTER NETWORK, INC.;
UNIVERSAL COMPUTER FORMS, LTD;
UNIVERSAL COMPUTER CONSULTING,

Plaintiffs-Appellants,

versus

VOLVO CARS OF NORTH AMERICA, INC.,

Defendant-Appellee.
_____

Appeal from the United States District Court
for the Eastern District of Texas
(H-96-CV-2389)
_____

January 6, 2000

Before JOLLY, EMILIO M. GARZA, and BENAVIDES, Circuit Judges.

PER CURIAM:[*]

The plaintiffs sued the defendant for violations of sections I and II of the Sherman Act and for tortious interference with existing contracts and with prospective business relations under Texas law. The defendant filed a summary judgment motion on all claims, which the district court granted. The defendants have appealed the dismissal of their claims. We have reviewed the

_____

[*]Pursuant to 5TH CIR. R. 47.5, the court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5TH CIR. R. 47.5.4.

record, studied the briefs, and considered the arguments made by counsel. For the reasons stated herein, we affirm.

I

In the United States, most automobile dealerships are separate and independent from automobile manufacturers. Dealerships usually rely on a computerized Dealer Management System ("DMS") to help track inventory, manage warranty and parts records, and perform accounting functions. A DMS consists of both hardware, software, and often technical support. The three largest sellers of DMSs are Universal Computer Systems ("Universal"), Automatic Data Processing ("ADP"), and The Reynolds & Reynolds Company ("R&R"). These companies sell the DMSs directly to the individual auto dealerships. The systems sold to the dealerships are similar to one another regardless of what make of cars that dealership carries. There are, however, minor alterations made to ensure compatibility with different manufacturers' computer systems and to account for idiosyncracies of individual dealerships.

Volvo Cars of North America has 365 dealerships in the United States. In 1994, Universal had contracts with twelve of those dealers to provide them with DMSs. In the spring of 1994, Volvo began looking for ways to improve its information systems, leading it to form the Dealer Systems Steering Committee in September 1994. Volvo selected ten representative dealers to participate along with five of its own employees. Two main concerns were raised during the committee's meetings. The first, which was primarily that of

the dealers, was a general concern about the level of, and differences in, prices dealers were having to pay for DMSs. The second concern, which was exclusively Volvo's, was that there were too many suppliers of DMSs, which made it more costly for Volvo to maintain compatibility with its dealers' different systems. As a result of these meetings, the committee asked Universal, ADP, and R&R to prepare presentations on their services, including pricing information. Universal's presentation failed to provide information on prices, while its competitors complied with the committee's request.

In February 1995, the committee met to discuss the DMS providers. It later recommended that Volvo approve ADP and R&R, but not Universal, as approved DMS providers. Volvo followed this recommendation and approved Universal's two competitors. Although Volvo did not require its dealers to use DMSs from approved vendors, the dealers would have to do so to participate in Volvo's "Partnering For Excellence" program, which provided monetary benefits to participating dealers.

Universal filed suit in 1996, charging Volvo with violations of Sections I and II of the Sherman Act and tortious interference with existing contracts and with prospective business relations under Texas law. The district court first dismissed the Section II claim on summary judgment at the magistrate judge's recommendation. The magistrate judge concluded that Universal had failed to establish a relevant market that Volvo had monopolized or attempted

to monopolize, and that Universal had not alleged harm with sufficient particularity. However, the court offered Universal an opportunity to amend its pleading to specify the harm. Universal did amend its pleading. The magistrate judge later recommended, and the district court agreed, that the Section I and tortious interference claims be dismissed as well. The magistrate judge's opinion rejected the contention that Volvo's actions constituted a per se violation; the magistrate judge concluded that Volvo's decision to recommend two vendors was not an agreement to fix prices. With respect to the rule of reason, the magistrate judge concluded that Universal had again failed to establish a relevant market, and in addition, that Universal had not demonstrated an injury to competition. Because Volvo's actions did not constitute Sherman Act violations, according to the magistrate judge, they were not unlawful, so Volvo's actions were privileged with respect to the tortious interference claims. The district court adopted the magistrate judge's recommendations and entered judgment dismissing the complaint.

## II

We first turn to the question of jurisdiction. Volvo argues that Universal does not have standing, because establishing antitrust standing requires allegation and proof of more than just an injury-in-fact to the individual defendant. Volvo cites to a Second Circuit case for the proposition that Universal must allege an "antitrust injury"--an actual adverse effect on competition in

4

the relevant market.  See George Haug v. Rolls Royce Motor Cars, 148 F.3d 136, 139-40 (2d Cir. 1998)(requiring an allegation that elimination from the marketplace harmed competition).

We are, however, governed by the precedent of our own circuit. Since 1983, we have distinguished between "antitrust injuries" and "injuries to competition," the latter of which is often a component of substantive liability.  Multiflex, Inc. v. Samuel Moore & Co., 709 F.2d 980, 986 n.6 (5th Cir. 1983).  And in 1984, we explained that the antitrust laws do not require a plaintiff to establish an injury to competition as an element of standing:

> In this circuit, an antitrust injury for standing purposes should be viewed from the perspective of the plaintiff's position in the marketplace, not from the merits-related perspective of the impact of a defendant's conduct on overall competition.  So viewed, any alleged losses and competitive disadvantage fall easily within the conceptual bounds of antitrust injury, whatever the ultimate merits of its case.

Walker v. U-Haul Co.,  747 F.2d 1011, 1016 (5th Cir.), modifying, 734 F.2d 1068 (5th Cir. 1984).  Universal has alleged an injury to its position in the marketplace and therefore has standing to pursue this suit.

                                III

One of the first hurdles any plaintiff must overcome in bringing claims under either section I or II of the Sherman Act is to define the relevant market.  See Doctor's Hospital of Jefferson, Inc. v. Southeast Medical Alliance, Inc., 123 F.3d 301, 311 (5th Cir. 1997)(must establish relevant market in Section II conspiracy

to monopolize case); <u>R.D. Imports Ryno Industries, Inc. v. Mazda Distributors (Gulf), Inc.</u>, 807 F.2d 1222, 1224 (5th Cir. 1987)(must establish relevant market in Section I claims); <u>Seidenstein v. National Medical Enterprises, Inc.</u>, 769 F.2d 1100, 1106 (5th Cir. 1985)(must establish the relevant market for Section II claims generally). Because the district court granted Volvo's motion for summary judgment, we review this issue <u>de novo</u>. <u>Cabrol v. Town of Youngsville</u>, 106 F.3d 101, 105 (5th Cir. 1997).[1]

Universal has attempted to define the relevant market as American Volvo dealerships, as opposed to all automobile dealerships nationwide. In support, Universal cites to <u>Heatransfer Corp. v. Volkswagenwerk, A.G.</u>, 553 F.2d 964 (5th Cir. 1977). But that case suggests otherwise.

In <u>Heatransfer</u>, 553 F.2d at 980, the plaintiff manufactured air conditioning equipment for Volkswagen automobiles. The market in that case consisted of manufacturers making specialized equipment that could only be sold to Volkswagen. <u>Id.</u> Moreover, most of the individual manufacturers did not make air conditioning equipment for any other automaker. <u>Id.</u> The court held that Volkswagen's purchases of air conditioning equipment did constitute

---

[1]Universal makes the unconvincing argument that defining the relevant market is fact-based and therefore inappropriate for summary judgment. Universal is correct that defining the relevant market is a fact-based question. The question is whether Universal has presented a genuine issue of material fact with respect to this issue. We think not.

a market.  In doing so, however, the court used a test that favors

Volvo in the present case:

> The Supreme Court has stated that "[t]he outer boundaries of a product market are determined by the reasonable interchangeability of use or the cross-elasticity of demand between the product itself and the substitutes for it.

Id.  In this case, the following characteristics all cut against

Universal:

(1) The DMSs for Volvo are reasonably interchangeable--they can be sold to other automobile dealerships with little or no modification.

(2) The marketwide elasticity of demand for Universal's products is not altered dramatically by Volvo's decision not to approve Universal's DMSs.

(3) Universal manufactures DMSs for a wide variety of automobile dealerships.

(4) Companies in the DMS industry generally sell to a wide variety of dealerships.

Thus, Universal has not defined a relevant market under

Heatransfer.[2]

In Seidenstein, 769 F.2d at 1106, we considered whether a

single hospital's cardiac facility could constitute a distinct

market when there were similar facilities in the city's other

hospitals.  We held that barring "unique services or facilities,"

that was not a legitimate Sherman Act market.  Id.  There is

---

[2]Universal's contention, that a market is defined by the ability of a company to affect prices, can lead to an irrational result.  Most companies have the ability to negotiate the price of non-commodity goods and services up or down with customers and suppliers.  But that does not mean that these are all relevant markets for antitrust purposes.

nothing cognizably unique in the antitrust sense about the Volvo dealer market here.

In <u>Domed Stadium</u>, 732, F.2d at 487-88, however, we conceded that sub-markets may exist in a larger market of interchangeable goods. But for there to be such a sub-market, we required:

> practical indicia [such] as industry or public recognition of the sub-market as a separate economic entity, the product's peculiar characteristics and uses, unique production facilities, distinct customers, distinct prices, sensitivity to price changes, and specialized vendors.

<u>Id.</u> Only one of these many criteria of a relevant sub-market exists in this case--distinct customers. Thus, Universal has also failed to establish a relevant sub-market under <u>Domed Stadium</u>.

Because Universal has failed to define a relevant market, we need not address the company's other arguments related to the Sherman Act.

## IV

As Universal conceded during oral argument, its tortious interference claims are based on the alleged antitrust contentions. Because we have held that Universal's Section I and II claims fail, so do its tort claims.

## V

For these reasons, the district court's dismissal of Universal's various claims is

A F F I R M E D.