**GOLDEN BEAR DISTRIBUTING SYSTEMS OF TEXAS, INC.,**
**Plaintiff-Appellee,**

v.

**CHASE REVEL, INC., d/b/a Entrepreneur Magazine, Defendant-Appellant.**

**No. 81–2492.**

United States Court of Appeals,
Fifth Circuit.

July 5, 1983.

---

Robert A. Schlanger, Houston, Tex., for defendant-appellant.

Bertrand L. Pourteau, II, Houston, Tex., for plaintiff-appellee.

Before THORNBERRY, GEE and REAVLEY, Circuit Judges.

THORNBERRY, Circuit Judge:

### I. Introduction:

In this diversity action, the plaintiff, Golden Bear Distributing Systems of Texas, Inc. (Golden Bear of Texas), a Texas corporation, sued Chase Revel, Inc., d/b/a Entrepreneur Magazine (Entrepreneur), for libel.[1] The jury found that the defendant defamed Golden Bear of Texas, and awarded compensatory and punitive damages. Entrepreneur appeals this judgment, challenging the sufficiency of the evidence, and claiming errors by the trial judge in not admitting evidence, as well as other errors of law. We affirm.

### II. Facts and Disposition Below:

Entrepreneur Magazine, a monthly publication owned by the defendant, publishes articles of interest to businessmen and others who wish to start their own businesses. Its circulation is nationwide, and includes 2,500 subscribers in Texas. In its monthly "Fraud" column, Entrepreneur exposes instances of consumer and investor fraud. In its March 1979 issue, Entrepreneur published as its "Fraud" feature an article entitled "Golden Bear Turns to Brass." The article was based on the activities of separate companies operating in several states under the name Golden Bear Distributing Systems, Inc., and relied heavily for its conclusions upon the results of an investigation by law

---

1. The parties stipulated that Texas law controlled the disposition of this case. Texas law defines libel as follows:

 A libel is a defamation expressed in printing or writing, ... tending to injure the reputation of one who is alive, and thereby expose him to public hatred, contempt or ridicule, or financial injury, or to impeach the honesty, integrity, or virtue, or reputation of any one, or to publish the natural defects of any one

and thereby expose such person to public hatred, ridicule, or financial injury.
Texas Rev.Civ.Stat.Ann. art. 5430 (Vernon 1958). The case was initially filed in Texas state court, but was subsequently removed to federal district court on motion by the defendant. After initiating this suit, Golden Bear of Texas filed a petition in the United States Bankruptcy Court for the Southern District of Texas, and the bankruptcy trustee was substituted as plaintiff in the case before us. For

enforcement officers into the companies' activities.[2]

The record shows that the various Golden Bear companies operated as franchises of the parent company, Golden Bear of California. Both the Texas and the California companies sold vending machines and pop to investors, promising them high returns on their investment through high volume sales in premium locations. However, apart from their common advertising and sales techniques, Golden Bear of Texas and Golden Bear of California had no apparent connection with one another. Their stock was separately issued and subscribed, and each company had its own management. Under the franchise agreement, however, Golden Bear of Texas was obligated to purchase the vending machines and pop from Golden Bear of California. It appears that at the time this suit was filed, Golden Bear of Texas had purchased and paid for machines from Golden Bear of California that were never delivered.

Entrepreneur's March 1979 "Fraud" feature described in detail an investment fraud lawsuit that the California Attorney General had brought against Golden Bear of California, as well as certain legal difficulties experienced by Golden Bear of Utah. In its description of the company's operations, the magazine also reported that "Golden Bear['s] promises were consistent throughout the country," and gave as an example the sales pitch used by a Golden Bear of Texas marketing director. Entrepreneur did not expressly state that Golden Bear of Texas defrauded investors, or that it was under investigation. After the article came out, Golden Bear of Texas rapidly lost its business, and was eventually forced to file for bankruptcy. Following trial and submission of separate interrogatories, the jury found that: (1) the article was libelous; (2) the overall impression conveyed by the article was to falsely impute the fraudulent conduct of Golden Bear of California to the Texas company; (3) this libel was the proximate cause of the plaintiff's injuries; (4)

Entrepreneur knew that the article gave a false impression; (5) Entrepreneur published the article with either malice or reckless disregard of the truth; (6) Entrepreneur should reasonably have known that a false impression would result; and (7) the article was communicated only to persons with a common interest in the subject matter. The jury then awarded to Golden Bear of Texas $30,000 in actual damages, and $20,000 in punitive damages.

III. *Analysis:*
 A. *First Amendment Standards*

In libel cases, the state's interest in preserving the reputation of its citizens and providing for compensation for injury caused by the publication of false statements must be balanced against the potential harm to the publisher's first amendment rights. Accordingly, the Supreme Court, in *Gertz v. Welch,* 418 U.S. 323, 94 S.Ct. 2997, 41 L.Ed.2d 789 (1974), held that the states may define the appropriate standard of liability for a defamatory falsehood of a private individual as they see fit, "so long as they do not impose liability without fault." 418 U.S. 347, 94 S.Ct. at 3010. The first and fourteenth amendments thus require at a minimum a showing of negligence before a private figure may recover an award of actual damages for libel. The *Gertz* Court also held that the states must require a showing of "actual malice," defined as ill will or reckless disregard of the falsity of the statement made, before a court may award punitive damages to private defamation plaintiffs, or to establish the defamation of "public figures." *Id.* at 350, 94 S.Ct. at 3012.

 B. *Texas Libel Law*

Texas libel law meets these constitutional requirements by requiring a showing of fault on the part of the publisher, and will not permit recovery of actual damages unless the publisher of the defamatory statement "knew or should have known that the ... statement was false." *Foster*

convenience sake, however, we will continue to refer to the plaintiff as "Golden Bear of Texas."

2. A complete copy of this article is found in the appendix to this opinion.

*v. Laredo Newspapers, Inc.*, 541 S.W.2d 809, 819 (Tex.1976). If the subject of the libel is a public figure or the publisher has a qualified privilege with respect to the subject or matter in contention, then the injured party must show actual malice, defined as in the constitutional standard as knowledge of falsity or reckless disregard. *Dun & Bradstreet, Inc. v. O'Neil,* 456 S.W.2d 896, 900 (Tex.1970); *British Overseas Airways Corp. v. Tours & Travel of Houston, Inc.,* 568 S.W.2d 888, 893 (Tex.Civ.App.—Houston 1978, writ ref'd n.r.e.).

> "Reckless disregard" requires proof that a false defamatory statement was made with a "high degree of awareness of [its] probable falsity." *Garrison v. Louisiana,* 379 U.S. 64, 74, 85 S.Ct. 209, 215, 13 L.Ed.2d 125 (1964). There must be sufficient evidence to conclude that the defendant in fact entertained "serious doubts" as to the truth of the publication. *St. Amant v. Thompson,* 390 U.S. 727, 731, 88 S.Ct. 1323, 1325, 20 L.Ed.2d 262 (1968).

*Foster v. Upchurch,* 624 S.W.2d 564, 566 (Tex.1981).

### C. *Is the Article Actionable?*

Our first inquiry is whether the article is libelous. We are guided in our analysis by the rule announced by the Texas Supreme Court in *Cotulla v. Kerr,* 74 Tex. 89, 11 S.W. 1058 (Tex.1889):

> In the absence of doubt or ambiguity growing out of the language used in the publication, we understand it to be the duty of the court to determine and instruct the jury whether or not it is libelous; but, where there is uncertainty or doubt, it is the duty of the court to give the jury a definition of what is a libel, and leave it for the jury to say whether the offense has been proved.

*Id.* at 1059. *See Denton Publishing Co. v. Boyd,* 460 S.W.2d 881, 884 (Tex.1971); *Fitzjarrald v. Panhandle Publishing Co.,* 149 Tex. 87, 228 S.W.2d 499, 505 (Tex.1950).

■ In determining whether a publication contains actionable defamatory meaning, Texas law looks to the effect the article has on the mind of the "ordinary reader." *See Rose v. Enterprise Co.,* 617 S.W.2d 737, 740 (Tex.Civ.App.—Beaumont 1981, writ ref'd n.r.e.). *See generally,* Restatement (Second) of Torts § 614 & comment b (1977). The allegedly defamatory publication must be construed as a whole. If a defamatory meaning *may* exist, then the statement or article is considered ambiguous, and the court must allow the jury to determine whether an ordinary reader would perceive the statement as defamatory. *See Raymer v. Doubleday & Co.,* 615 F.2d 241, 246 (5th Cir.), *cert. denied,* 449 U.S. 838, 101 S.Ct. 115, 66 L.Ed.2d 45 (1980) (applying Texas law).

■ The evidence presented at trial suggests that all the individual statements in the magazine article concerning Golden Bear of California's fraudulent activities and Golden Bear of Texas' representations to potential investors were true. The basis of the libel lies in the juxtaposition of truthful statements about one company with truthful statements about the illegal operations of an independent company of the same name located in a different state.

We conclude that the district court correctly followed Texas law in submitting the article to the jury. Although a literal reader might have realized that the article did not state that Golden Bear of Texas had not been investigated by law enforcement authorities and was not in any way implicated in the fraud perpetrated by Golden Bear of California, we think that an ordinary reader could infer from the article that Golden Bear of Texas engaged in illegal actions much like Golden Bear of California. Since the overall import of the article was capable of two interpretations, one of which was potentially defamatory, it was proper for the trial judge to submit the article to the jury. The jury found the overall effect of the article to be defamatory because the article imputed wrongdoing to Golden Bear of Texas. Since ample evidence exists in the record to support this jury finding, we decline to disturb it. The article stated that Golden Bear's promises were consistent

throughout the country. The article then went on to characterize the promises made by Golden Bear of California as false. It was reasonable for the jury to find that an ordinary reader could conclude that the Texas company's promises were false as well.

### D. *Truth*

 Entrepreneur next asserts truth as a defense to its actions. Under Texas law, truth is a complete defense in defamation actions. Texas Rev.Civ.Stat.Ann. art. 5431 (Vernon 1958). We reject this contention. Although the individual statements printed in the article, if read out of context, were true, the jury found that their overall effect was defamatory. For the truth defense to apply here, the defamatory interpretation of the article would have to be true. That is, Golden Bear of Texas would have had to have engaged in fraudulent activities similar to those carried out by Golden Bear of California. Entrepreneur failed to carry its burden of proof on this issue. The record is barren of any testimony tending to show fraudulent activities by Golden Bear of Texas. Furthermore, the author of the article admitted at trial that at the time she wrote the article, she had no evidence that any misrepresentations had been made by Golden Bear of Texas. We think that our disposition of this issue falls precisely within the rule set forth in *Express Publishing Co. v. Gonzalez,* 350 S.W.2d 589 (Tex.Civ.App.—Eastland 1961, writ ref'd, n.r.e.), where the court announced:

> Although the truth of an alleged libel may be proven as a complete defense, it is not a defense to show that a statement contained in a publication, if taken alone, is literally true, when other facts are omitted which plainly refute the false impression of the partial statement. A statement is not true or even substantially true if, by implication, an entirely un-

true impression is made by omission of part of the facts.

*Id.* at 592. We hold that the assertion of truth as a defense here must fail.

### E. *Privileged communication?*

 Under Texas law, a publisher may publish certain privileged matters without being liable in libel. Article 5432 provides that "the publication of the following matters by any newspaper or periodical shall be deemed privileged and shall not be made the basis of any action for libel.... 4. A reasonable and fair comment or criticism of ... matters of public concern published for general information." Texas Rev.Civ.Stat.Ann. art. 5432 (Vernon 1958).[3] The privilege granted to publishers under article 5432 is a qualified privilege. Thus, "[a] report which is not fair, true and impartial, or which is actuated by malice, does not enjoy this privilege." *Denton Publishing Co. v. Boyd,* 460 S.W.2d 881, 884 (Tex. 1970). Moreover, privilege is an affirmative defense, and "the defendant has the burden of proving that the publication is privileged." *Id.* Finally, the privilege extends only to "fair comment or criticism." False statements of *fact* are not protected by the qualified privilege under article 5432, and are actionable for libel. *Bell Publishing Co. v. Garrett Engineering Co.,* 141 Tex. 51, 170 S.W.2d 197, 204–05 (Comm'n App.1943, judgment adopted).

 Applying these principles to our case, we conclude that Entrepreneur failed to carry its burden of proof that the publication was privileged. Our conclusion is supported by two facts. First, although Entrepreneur asserted in its answer to the plaintiff's complaint that the article was privileged, it failed to offer any evidence on this issue. Moreover, it did not request that this issue be submitted to the jury, nor did it ask the district court to rule on it. These facts lead us to conclude that Entrepreneur

---

**3.** Entrepreneur admitted at oral argument that it was not relying on this statute as a defense for its actions. However, in view of the clear

state interest in protecting publishers of certain defamatory statements, we feel obliged to address this issue.

has waived its affirmative defense of privilege. *See Denton,* 460 S.W.2d at 885.

■ Second, even assuming that Entrepreneur did not waive this defense, we do not view the article as a fair comment or criticism on a matter of public interest. Rather, all the statements in the article referring to Golden Bear of Texas were statements of fact, describing the response of a Golden Bear of Texas marketing director to questions posed to him by the author of the article. These statements impliedly imputed to Golden Bear of Texas wrongdoing by Golden Bear of Texas, and were defamatory under article 5430.

Even if Entrepreneur were entitled to assert privilege as a defense, we conclude that Golden Bear of Texas has met its burden of overcoming that defense by proving that Entrepreneur published the defamatory article with reckless disregard of the truth.

"[M]alice cannot be inferred from the character of the language used, if privileged, without *other evidence* to prove it . . . . The issue of malice ordinarily is a question of fact for the jury to determine." *Fitzjarrald,* 228 S.W.2d at 505 (emphasis added). *See Foster v. Upchurch,* 624 S.W.2d at 566. The Supreme Court had defined "actual malice" as "knowledge that [the statement] . . . was false or [was made] with reckless disregard of whether it was false or not." *New York Times Co. v. Sullivan,* 376 U.S. 254, 84 S.Ct. 710, 725–26, 11 L.Ed.2d 686 (1964). In *Foster v. Upchurch,* the Texas Supreme Court held that in proving reckless disregard of the truth, the plaintiff must show that the publisher of the defamatory statement entertained serious doubts as to the truth of the publication. It is not enough to show that the publisher made a mistake. 624 S.W.2d at

566. *See generally* Restatement (Second) of Torts, § 580A and comment d (1977). At trial, both the author of the article and an editor of Entrepreneur admitted that they were not aware of any false promises to investors by Golden Bear of Texas. The author's notes clearly indicate her awareness that Golden Bear of Texas and Golden Bear of California were in fact separate entities, that Golden Bear of Texas was financially sound, and that Golden Bear of California probably succeeded in defrauding the Texas corporation. Moreover, after the article came out, Golden Bear of Texas contacted Entrepreneur, offering to prove that it was innocent of any wrongdoing, and asking that Entrepreneur print a retraction. Entrepreneur refused. "Under certain circumstances evidence [of a refusal by a publisher to retract a statement after it has been demonstrated to him to be both false and defamatory] . . . might be relevant in showing recklessness at the time the statement was published." Restatement of Torts (Second), *supra,* § 580A comment d, at 219. The record demonstrates that Entrepreneur had sufficient time to investigate the activities of Golden Bear of Texas to determine its possible participation in the investment fraud. We conclude that the evidence supports the jury finding that Entrepreneur published the article with reckless disregard of the truth. *See British Overseas Airways,* 568 S.W.2d at 893.[4]

## F. *Additional Claims*

■ Entrepreneur advances a number of other arguments for reversing the jury award, or remanding the case for a new trial.

1. *Lost profits.* Entrepreneur claims that the jury should not have awarded Golden Bear of Texas lost profits because

---

4. Entrepreneur also advanced an alternative theory in support of its claim of qualified privilege. That theory was based on the protection afforded certain business-related communications. *See Dixon v. Southwestern Bell Telephone Co.,* 607 S.W.2d 240 (Tex.1980). Since privilege under that theory affords no greater protection to Entrepreneur than does the privilege under article 5432, our conclusion that Golden Bear of Texas overcame Entrepreneur's defense of qualified immunity under article 5432 by proving reckless disregard of the truth makes it unnecessary for us to reach this issue, and we intimate no opinion on its validity.

the business was in operation for less than six months before the defamatory statement was published, and lost profits could not be established with any reasonable certainty. Texas law permits the recovery of the expected profits of a business only if "there was some data and history of profits from an established business." *Atomic Fuel Extraction Corp. v. Slick's Estate,* 386 S.W.2d 180, 188 (Tex.Civ.App.—San Antonio 1964, writ ref'd n.r.e. 403 S.W.2d 784 [Tex.]). *Accord, Keener v. Sizzler Family Steak Houses,* 597 F.2d 453, 458 (5th Cir. 1979); *First Texas Savings Ass'n of Dallas v. Dicker Center, Inc.,* 631 S.W.2d 179, 187 (Tex.App.—Tyler 1982, no writ). These cases denied awards based on projected profits because the businesses in question had operated at a loss over the short periods they had been in operation.

■ Golden Bear of Texas presented evidence showing that it had been earning a profit from the very first months of its operation, and that its receipts dropped off rapidly in the months following publication of the article. The record of profitability, rather than the age of the business, is determinative of this issue under Texas law. *See Bell Helicopter Co. v. Bradshaw,* 594 S.W.2d 519, 536 (Tex.Civ.App.—Corpus Christi 1979, no writ) (four-month-old business able to recover future profits because it was shown to be both established and profitable). We conclude that there was sufficient evidence for the jury to establish the amount of damages.

■ 2. *Admission of Testimony.* Entrepreneur next contends that the district court's exclusion of the magazine's reporter's discussions with California law enforcement officials concerning Golden Bear of California's fraudulent activities amounted to reversible error. The court held that this evidence was inadmissible because it was overly prejudicial to Golden Bear of Texas, reasoning that the jury might have mistakenly attributed specific instances of wrongdoing by the California corporation to the Texas corporation. The court permitted the reporter to say that she had spoken to the various California officials, and that she therefore had a reason to write the article.

The court also excluded testimony by various Golden Bear of Texas sales representatives after one company manager gave evidence of the substance of the company's sales techniques.

■ We are bound to uphold a trial court's determination that the potential prejudice of admitting evidence outweighs its probative value, except where the exclusion of testimony constitutes an abuse of discretion. *See Ballou v. Henri Studios, Inc.,* 656 F.2d 1147, 1153 (5th Cir.1981); *United States v. Renfro,* 620 F.2d 497, 500 (5th Cir.), *cert. denied,* 449 U.S. 921, 101 S.Ct. 321, 66 L.Ed.2d 149 (1980). Similarly, the trial court's decision to exclude cumulative evidence is within its "broad and sound discretion," *Johnson v. William C. Ellis & Sons Iron Works, Inc.,* 604 F.2d 950, 958 (5th Cir.1979). Since the evidence that the defendant wished to introduce was substantially before the jury, the trial court reasonably concluded that additional evidence concerning the above matters had minimal additional probative value, which was outweighed by its prejudicial effect.[5]

5. Entrepreneur also contends that the trial court committed reversible error by excluding a previous draft of the article which contained an account of Golden Bear's involvement with organized crime. Entrepreneur claims that its deletion from the final draft of the passage referring to organized crime demonstrates its good faith reporting, and is probative of the question whether it acted with reckless disregard of the truth. We need not address this issue because the record demonstrates that counsel for Entrepreneur failed to preserve his claim of error below by making a specific objection. It is well-established that failure to register a specific objection precludes appellate review of a claimed error, except where this would result in a miscarriage of justice. The power to consider errors not preserved for review "should be exercised only in exceptional cases...." *Colonial Refrigerated Transportation, Inc. v. Mitchell,* 403 F.2d 541, 552 (5th Cir.1968). We decline to exercise this power here.

3. *Public Figure.* Entrepreneur contends that the trial court improperly denied its motion for leave to amend its answer to include the claim that Golden Bear of Texas was a "public figure." The court found as a matter of law that Golden Bear of Texas was not a "public figure." In *Gertz v. Robert Welch, Inc.,* 418 U.S. 323, 345, 94 S.Ct. 2997, 3009, 41 L.Ed.2d 789 (1974), the Supreme Court defined "public figures" as those who either "occupy positions of such persuasive power and influence that they are deemed public figures for all purposes," or those who become public figures with respect to a particular public controversy because they have "thrust themselves to the forefront ... in order to influence the resolution of the issues involved." To achieve this status, the plaintiff must be involved in a public controversy before the defamatory statement is published, for "those charged with defamation cannot, by their own conduct, create their own defense by making the claimant a public figure." *Hutchinson v. Proxmire,* 443 U.S. 111, 130, 136, 99 S.Ct. 2675, 2688, 61 L.Ed.2d 411 (1979).

Entrepreneur argues that the corporation is a public figure by reason of its business advertising, citing the Third Circuit's opinion in *Steaks Unlimited, Inc. v. Deaner,* 623 F.2d 264 (3d Cir.1980). In that case, however, the court found a "pre-existing public controversy" in the numerous complaints to the defendant television station and Bureau of Consumer affairs regarding false advertisements. Here, Golden Bear of Texas did not "thrust itself" into a public controversy by merely advertising its services. Were we to agree with Entrepreneur's hypothesis, the mere fact of advertising would render all businesses public figures.

### IV. *Conclusion:*

For the reasons stated above, the judgment of the district court is AFFIRMED.

APPENDIX

## FRAUD

## Golden Bear Turns to Brass

Another alleged fraudulent vending machine operation has been unearthed by IEA investigators. As of this writing, several companies using the name Golden Bear Distributing Systems, Inc., have attracted the attention of law enforcement agencies in various states.

Golden Bear offers opportunities for distributors to buy vending machines which dispense cans of soda. These investors would purchase soda from Golden Bear, replenish their machines twice weekly, and collect their profits.

California, which apparently was Golden Bear's first state of operation, filed an investment fraud lawsuit against the company in December, 1978. Over 100 California investors were taken in by promises of high sales volume and large profits. These predictions seemed credible because of an extensive advertising campaign conducted on radio and in the newspapers.

Golden Bear told their investors that they would sell an average of 20 to 30 cans of soda per day. This high volume would easily be attained because Golden Bear and its staff of professional locators would secure sites where at least 20 to 40 potential customers and additional high foot traffic existed. Golden Bear further told their potential buyers that the company would sell vending machines at cost; they claimed they made more money selling soda to the distributors, not on the sale of vending machines.

### Promises, Promises

These Golden Bear promises were consistent throughout the country. Official court records in California document Golden Bear's pledges there. An IEA investigator posed as an interested investor and called Golden Bear's offices in Houston, Texas. He was told that people "especially trained to locate vending machines" would find "profitable, classy locations where the machines would be exposed to a number of people." One of the marketing directors of the Houston company assured the IEA investigator that each machine would sell at least one case of soda (24 cans) per day. Minimum investment would be over $6,000 for four machines.

The California Attorney General's Office filed a complaint charging Golden Bear with numerous violations of the Business and Professions Code and of California common law. The major portion of the complaint concerns alleged misrepresentations which include: a promised 100 percent return on investment within one year; professionally located sites for the machines (generally promised in office buildings with at least 20 employees); relocation of the machines at little or no cost to the investor if the sites did not prove profitable; all materials purchased from the company (soda and vending machines) would be provided at the lowest possible cost to the distributor; the machines were almost invulnerable to breakdown; and they would be delivered in 120 days. (This was promised in the written contracts; verbal agreements assured delivery in 45 to 60 days.)

### True Confessions

According to declarations submitted by investors, few, if any, of Golden Bear's promises held true. The first group of investors, those that actually received vending machines, complained that the locations provided did not yield the projected sales of 20 to 30 cans sold per day. Investor Richard Davila told the Attorney General's Office that Golden Bear assured him he would make a profit of 25 to 37 percent per can of soda. They further guaranteed professional site locators would place his machines in prime locations. If he bought 10 machines, he could earn over $20,000 in yearly profits. However, in order to earn the promised profits, Mr. Davila's machines would have had to dispense a minimum of 50 to 75 cans per day. Mr. Davila purchased 11 machines from Golden Bear but received delivery on only seven of them. The actual sales volume differed greatly from Golden Bear's lofty promises. One of Mr. Davila's machines sold no soda at all; his greatest daily volume was 8 cans sold. Vending machines were sold to investors for $1,200; Golden Bear paid $400 for them.

The second group of investors, after paying cash up front, reported that they did not receive any machines at all. When they questioned the company, they were told the machines were malfunctioning at the suppliers, and they would be delivered shortly. However, no machines were forthcoming. (In fact, the supplier, the Cornelius Company of Minneapolis, Minnesota, is owed over $65,000 by Golden Bear in California and has cut off all shipments of merchandise.) Demands for refunds went unanswered.

### Active in Many Locations

As we go to press, Golden Bear appears to be on shaky ground in several other states as well. The company attempted to set up operation in Salt Lake City, Utah, but was prevented from doing so because of a unique arrangement between Salt Lake newspapers and the Utah Attorney General's (AG) Office. In Salt Lake City, the Newspaper Agency Corporation automatically turns over all business opportunity advertisements to the AG's Office. The company in question is then sent a 12-question form to fill out. Golden Bear responded to the form by sending their public relations package. When they ignored additional requests for information, the AG's office told the newspapers not to run the ad.

In California, a preliminary injunction was issued against Golden Bear which effectively prevents them from operating until a trial is conducted. They were restrained from withdrawing money from their bank accounts. Two days after the preliminary injunction became effective, Golden Bear's California phone numbers were disconnected with no forwarding number.

All California charges filed are civil; criminal charges, if filed, would be issued by the U.S. Department of Justice. A U.S. Attorney acknowledged familiarity with the Golden Bear situation, but answered all our questions with, "We can neither confirm nor deny the existence of a criminal investigation."

Again, we caution you—before you agree to buy a franchise or vending machine route, check the company out with the Better Business Bureau, the District Attorney's Office, and the local branch of your state Attorney General's Office.