I disagree with the holding of the majority that Pemberton did not present sufficient evidence to withstand a motion for JNOV. The articles published by the Birmingham News implicated Pemberton in the criminal activity of buying and selling paroles, even though the News had no evidence he had done anything illegal. Those responsible for the story knew he was an attorney and could legitimately represent clients for a fee before the parole board. They also knew that their only information linking Pemberton to any impropriety came from a highly unreliable source.
James Jacobson, the editor-in-chief of the Birmingham News, and Clark Stallworth, the associate editor who worked with Winne throughout the investigation, made the final decisions on publishing the parole stories. The News editors chose to run the article about Pemberton at the top of the front page with a large headline reading, "House clerk helps arrange paroles, News-launched investigation reveals." Next to the article was a picture of Pemberton. Evidence of actual malice may come from the writing of the headline to go with an article. Hunt v.Liberty Lobby, 720 F.2d 631, 646 (11th Cir. 1983).
Immediately below the article on Pemberton was a story about the arrest of Andrew Cooper for accepting bribes to obtain a parole for a prisoner. The headline for this article was, "Deputy prison commissioner quits after bribe arrest." In the center of the page, also beneath the article on Pemberton, was a picture of Cooper being taken into the courthouse by the police. Beneath Pemberton's picture was an article headlined "Long wait, delays . . . call came." This article described the reporter's contacts with a middleman in an attempt to buy a parole. At the bottom of the page was an article by Stallworth entitled "Paroles for sale?" The defamatory impact of an article may come from the context in which it is placed. GoldenBear Distr. Systems of Texas, Inc. v. Chase Revel, Inc.,708 F.2d 944 (5th Cir. 1983); Braun v. Flynt, 726 F.2d 245 (5th Cir. 1984).
The only informant to say that Pemberton was involved in illegal efforts to obtain paroles was James King, whose credibility was too much in doubt for the News to consider him a reliable source. Not only was he a convicted criminal, but also he had lied to Winne and the others in the investigation. He had said the entire $3000 would go to his contact, but he immediately spent much of it on himself. King also named two different individuals as his contact. "[R]ecklessness may be found where there are obvious reasons to doubt the veracity of the informant or the accuracy of his reports." St. Amant v.Thompson, 390 U.S. 727, 730, 88 S.Ct. 1323, 1325,20 L.Ed.2d 262 (1968), citing Curtis Publishing Co. v. Butts,388 U.S. 130, 87 S.Ct. 1975, 18 L.Ed.2d 1094 (1967).
Prior to giving King the money, Winne insisted on speaking to the official who was to receive the money. Law enforcement officers monitoring the telephone conversation later said that the voice was not Pemberton's, and Winne informed Stallworth of this fact. Nevertheless, the article on Winne's investigation states that Winne "was to meet with the middle-man who would take $3,000 cash to a top state official he would not name (though other sources had). . . ." The article proceeded to describe the telephone conversation, including the statement that "the voice assured me it knew the right people to pay off to get a parole." The article later identified Pemberton as King's contact, but did not mention that the voice on the phone was not Pemberton's or that King had first named Ealon Lambert as his contact.
When King received the money, he did not go directly to his contact. Instead, he used part of the money to buy himself a truck and then took his wife out to dinner. Officers from the Governor's Task Force on Crime and Corruption followed King and his wife and arrested them when they went home. When the officers questioned King that night at a Birmingham police station, they told him if he did not cooperate *Page 270 
with them he could be prosecuted for theft and sent to jail for life without parole as a habitual offender. He identified his contact as Ealon Lambert. The Task Force officers placed King and his wife in a motel room for the night, with the telephone disconnected. The next morning, King changed his story and said that Pemberton was his contact. Winne and Stallworth knew that King had at first named Lambert as his contact and had only named Pemberton later. The jury could have determined that the News acted with reckless disregard of the truth or falsity of its publication because it relied on King's information given under these circumstances.
King later met with Pemberton. Pemberton accepted $1500 to represent the inmate. The attorney monitoring the conversation for the Department of Public Safety determined that there was no violation of the criminal law. Winne, Stallworth, and Jacobson all knew of this determination.
Winne's inquiries at the Parole Board and the Ethics Commission had revealed only three or four parole cases in which Pemberton was involved. The Pemberton article implied that these paroles took place under suspicious circumstances, but the parole records do not bear out this charge. For example, the article states that the routine parole date for one of the inmates represented by Pemberton was November 1979 when in fact it was March 1978. The inmate was paroled in April 1978. As to another inmate for whom Pemberton telephoned the parole board, the article merely stated that "There is no indication whether money was paid him," when in fact both the parolee and her aunt had told Winne that Pemberton had not been paid any money. The article also quotes a source as saying that Pemberton called the parole board regularly, "sometimes up to 20 times a month." It did not mention that legislators frequently referred calls from their constituents about inmates to Pemberton. Pemberton, as Clerk of the House, made these inquiries for his employers, the members of the House of Representatives.
When asked whether he knew the article was accusing Pemberton of selling paroles, Stallworth answered, "I think that's a fair implication." Stallworth also testified that he thought it was fair to call Pemberton for his comments at 5 a.m. immediately prior to the printing of the article.
The News published the Pemberton story on Saturday, August 8, because of Cooper's arrest on Friday, August 7. Winne was in Montgomery on Friday for the arrest of Cooper and saw a Montgomery television reporter at the district attorney's office. He drove to Birmingham that night and spent the whole night writing the Pemberton story so it could be released the next morning. Stallworth came in to the News offices at 3 a.m. and told Winne to call Pemberton for comments. Winne called Pemberton at 5 a.m. and Ealon Lambert at 5:30. Stallworth called Jacobson to the office to review the story before the printing deadline around 6:30 or 7:00. The evidence reveals no connection whatsoever between the allegations against Cooper and the allegations concerning Pemberton.
The record contains sufficient evidence that the News acted with at least reckless disregard of the truth or falsity of its allegations that Pemberton was involved in illegal activity. I therefore would reverse the trial court's order granting judgment notwithstanding the verdict.
FAULKNER and JONES, JJ., concur.