**WORLD BOXING COUNCIL, Plaintiff,**

v.

**Howard COSELL, Defendant.**

**No. 86 Civ. 9738 (WCC).**

United States District Court,
S.D. New York.

June 29, 1989.

As Amended June 30, 1989.

---

**1260**

Christine Karol Roberts and Steve Sumner, Dallas, Tex., and Simon, Freidman & Associates, Hauppage, N.Y. (Richard Simon, of counsel), for plaintiff.

Squadron, Ellenoff, Plesent & Lehrer, New York City (Slade R. Metcalf, Barry S. Gold and Mark H. Jackson, of counsel), for defendant.

## AMENDED OPINION AND ORDER

### WILLIAM C. CONNER, District Judge:

This bout between boxing heavyweights pits plaintiff, the World Boxing Council (the "WBC"), against defendant, sportscaster Howard Cosell ("Cosell"). In this diversity action, the WBC charges Cosell with libel for a passage in a book he co-authored with writer Peter Bonventre, entitled *I Never Played the Game.* Cosell counterpunches with a motion for summary judgment under Rule 56, Fed.R.Civ.P., on the ground that the passage in question is constitutionally protected opinion, or, alternatively, that it cannot be demonstrated that he wrote the passage with actual malice. For the reasons articulated below, Co-

sell's motion for summary judgment is granted.

## BACKGROUND

*I Never Played the Game* recounts some of Cosell's experiences in professional sports, and expresses his views about the problems afflicting sports in the United States. A significant portion of the book—three chapters—is devoted to boxing. In these chapters, Cosell decries what he perceives to be suspect ratings and dangerous mismatches. He insists that these blemishes on the sport are the product of the concentration of power in unaccountable rating and sanctioning bodies, like the WBC, and powerful individual promoters, like Don King.

The alleged libel occurs in a passage in Chapter 7:

> King derives much of his power through his sway over Jose Sulaiman, the president of the World Boxing Council. The WBC is based in Mexico City, the WBA in Panama, and while each is supposed to be an independent regulator of boxing, both are in reality conspirators in rigging ratings. These organizations are basically instruments of extortion—playing by their own rules, creating their own champions—easily manipulated by the gifts and favors of promoters and managers who are seeking special considerations for their fighters.

H. Cosell, *I Never Played the Game* at 182–183 (1985). The three allegedly libelous comments contained in the passage are, "conspirators in rigging ratings," "instruments of extortion," and "easily manipulated by the gifts and favors of promoters and managers who are seeking special considerations for their fighters." In these comments, the WBC contends, Cosell accuses it of the crimes of conspiracy, extortion, and bribery, as well as unethical practices such as rating fighters without regard to merit. In response, Cosell first argues that the passage is a constitutionally protected opinion because the language is loose and figurative, consistent with both his outspoken personality and the hyperbolic expression generally associated with box-

ing commentary. Second, Cosell maintains that, even if his remarks are construed as factual statements, summary judgment is still warranted, because the passage was not written with actual malice.

In boxing, a referee is empowered to end a bout and award the winner a technical knockout if one fighter is no longer able to defend himself. Analogously, in a court of law, a judge may curtail a case and award summary judgment if the evidence is "so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251–52, 106 S.Ct. 2505, 2512, 91 L.Ed.2d 202 (1986). I find that, even if Cosell's first legal swing is wide of the target, his second is "on the button;" if the challenged passage was a "low blow," plaintiff was neither deliberately nor recklessly fouled. Therefore, I grant Cosell's motion for summary judgment on the ground that the WBC has suffered a technical knockout on the issue of actual malice.[1]

## DISCUSSION

### I. Protected Opinion or Unprotected Fact?

It is axiomatic that an expression of opinion, no matter how vituperative, polemical, or obnoxious, is entitled to constitutional protection under the first amendment. *See Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 339–40, 94 S.Ct. 2997, 3006–07; 41 L.Ed.2d 789 (1974); *Letter Carriers v. Austin*, 418 U.S. 264, 284–86, 94 S.Ct. 2770, 2781–82, 41 L.Ed.2d 745 (1974); *Greenbelt Cooperative Publishing Ass'n v. Bresler*, 398 U.S. 6, 14, 90 S.Ct. 1537, 1541–42, 26 L.Ed.2d 6 (1970); *Mr. Chow of New York v. Ste. Jour Azur S.A.*, 759 F.2d 219, 224 (2d Cir.1985); *Davis v. Ross*, 754 F.2d 80, 85 (2d Cir.1985); *Cianci v. New Times Pub. Co.*, 639 F.2d 54, 61 (2d Cir.1980); *Hotchner v. Castillo-*

*Puche*, 551 F.2d 910, 913 (2d Cir.), *cert. denied, Hotchner v. Doubleday & Co.*, 434 U.S. 834, 98 S.Ct. 120, 54 L.Ed.2d 95 (1977); *Rizzuto v. Nexxus Products Co.*, 641 F.Supp. 473, 481 (S.D.N.Y.) (Weinfeld, J.), *aff'd*, 810 F.2d 1161 (2d Cir.1986).

It is equally well-settled that whether a statement constitutes fact or opinion is a question of law for the court. *See Letter Carriers*, 418 U.S. at 282, 94 S.Ct. at 2780; *Greenbelt*, 398 U.S. at 11–14, 90 S.Ct. at 1540–42; *Mr. Chow*, 759 F.2d at 224; *Davis*, 754 F.2d at 85; *Rizzuto*, 641 F.Supp. at 481; *accord Ollman v. Evans*, 750 F.2d 970, 979 (D.C.Cir.1984) (en banc), *cert. denied*, 471 U.S. 1127, 105 S.Ct. 2662, 86 L.Ed.2d 278 (1985). The court's inquiry must be made from the perspective of an "ordinary" reader of the statement. *Mr. Chow*, 759 F.2d at 224. What may appear to be a factual question is nevertheless reserved for the court, because of the special interest in enhancing the predictability of decisions in the first amendment area by separating fact from opinion according to announced legal standards, and publishing examples of the manner in which these standards are to be applied. *Ollman*, 750 F.2d at 978.

Although no bright-line test exists for differentiating opinion from fact, the court's inquiry must include the circumstances surrounding the controversial language. *Mr. Chow*, 759 F.2d at 226; *Ollman*, 750 F.2d at 978, 980 n. 17. Cosell argues that, read in the context of the sports world in general, the boxing world in particular, and his own notoriety, his remarks would be understood by an ordinary reader as an expression of opinion.

██ It is true that language which might be deemed libelous in other contexts has

---

1. State law governs diversity actions. *Erie Railroad Co. v. Tompkins*, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938). Since this case was transferred from the Northern District of Texas, Texas choice of law rules apply. *Van Dusen v. Barrack*, 376 U.S. 612, 84 S.Ct. 805, 11 L.Ed.2d 945 (1964). Both Texas and New York have an interest in this lawsuit. However, since federal constitutional law limits state defamation actions against public figures to cases involving factual statements made with actual malice, *see*

*generally Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 339–40, 94 S.Ct. 2997, 3006–07, 41 L.Ed.2d 789 (1974) (opinion); *New York Times v. Sullivan*, 376 U.S. 254, 279–80, 84 S.Ct. 710, 725–26, 11 L.Ed.2d 686 (1964) (actual malice); *Mr. Chow of New York v. Ste. Jour Azur S.A.*, 759 F.2d 219, 224 (2d Cir.1985) (opinion), and since I find that the statement challenged here was expressed without actual malice, I need not reach the question of which state's law governs the WBC's cause of action.

been tolerated and even encouraged in the world of professional sports.

Certainly, the sports world is an environment where the kind of 'robust' debate endorsed by the Supreme Court in *New York Times v. Sullivan* has flourished. Even the once fastidious etiquette of Wimbledon has succumbed to the more gross and tawdry vernacular formerly more characteristic of hockey rinks and football stadia. The world of Damon Runyon was not portrayed in the idiom of the church supper.

*Henderson v. Times Mirror Co.,* 669 F.Supp. 356, 361 (D.Colo.1987) (citation omitted), *aff'd,* 876 F.2d 108 (10th Cir.1989). Nevertheless, Cosell's remarks appear on their face to accuse the WBC of rigging ratings and extorting bribes. Thus, even considering the environment in which they were made, the challenged statements may not clearly be characterized as mere opinion. Other courts have repeatedly recognized the difficulty of distinguishing fact from opinion. *Mr. Chow,* 759 F.2d at 224; *Ollman,* 750 F.2d at 978; *Rinsley v. Brandt,* 700 F.2d 1304, 1309 (10th Cir. 1983). Fortunately, in this case, I need not resolve that troublesome question, because I hold that even if Cosell's comments are statements of fact, the WBC is unable to show that Cosell wrote them with actual malice.

## II. Actual Malice

### A. The Standard

The parties have stipulated that the WBC is a public figure for the purpose of this litigation. Therefore, this matter is controlled by the principles established by the Supreme Court in *New York Times v. Sullivan,* 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964), and its progeny.

At trial, the WBC would be required to demonstrate, by clear and convincing evidence, that the offending passage was false, and that Cosell wrote it with " 'actual malice'—that is, with knowledge that it was false or with reckless disregard of whether it was false or not." *Id.* at 279– 80, 84 S.Ct. at 726; *accord Gertz,* 418 U.S. at 327–28, 94 S.Ct. at 3000–01; *Contempo-*

*rary Mission, Inc., et al. v. New York Times,* 842 F.2d 612, 621 (2d Cir.1988); *Cianci,* 639 F.2d at 59; *Rizzuto,* 641 F.Supp. at 479. More specifically, "[t]he burden of proving 'actual malice' requires the plaintiff to demonstrate with clear and convincing evidence that the defendant realized that his statement was false or that he subjectively entertained serious doubt as to the truth of his statement." *Bose Corp. v. Consumers Union of United States,* 466 U.S. 485, 511 n. 30, 104 S.Ct. 1949, 1965 n. 30, 80 L.Ed.2d 502 (1984).

The burden of establishing clear and convincing evidence is heavier than the typical civil requirement of proof by a preponderance of the evidence, but lighter than the criminal rule that a trier be convinced beyond a reasonable doubt. *Yiamouyiannis v. Consumers Union of the United States,* 619 F.2d 932, 940 (2d Cir.), *cert. denied,* 449 U.S. 839, 101 S.Ct. 117, 66 L.Ed.2d 46 (1980). Under this standard, the evidence presented by plaintiff must be significantly probative and more than merely colorable. *Rizzuto,* 641 F.Supp. at 479.

The Supreme Court has held that where the clear and convincing evidence standard applies at trial, it governs a summary judgment motion as well. "[T]he inquiry involved in a ruling on a motion for summary judgment ... necessarily implicates the substantive evidentiary standard of proof that would apply at the trial on the merits." *Anderson,* 477 U.S. at 252, 106 S.Ct. at 2512. This rule continues to be the law of the Second Circuit. *Contemporary Mission,* 842 F.2d at 621; *Herbert v. Lando,* 781 F.2d 298, 305 (2d Cir.), *cert. denied,* 476 U.S. 1182, 106 S.Ct. 2916, 91 L.Ed.2d 545 (1986). The court is compelled to grant summary judgment, and dismiss the case, if it finds that a reasonable jury could not conclude that the WBC had shown, by clear and convincing evidence, actual malice on the part of Cosell. *See Liberty Lobby,* 477 U.S. at 252, 106 S.Ct. at 2512.

No reasonable jury could find actual malice in this case, because, regardless of the truth of the assertions in Cosell's passage, the WBC is unable to raise an issue of fact regarding Cosell's subjective state of mind

when he wrote them. "When the moving party has carried its burden under Rule 56(c), its opponent must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Electrical Industrial Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986). It must establish that there is a "genuine issue for trial." *Id.* at 587, 106 S.Ct. at 1356. Cosell offers substantial, uncontested evidence that, irrespective of the truth of the assertions he makes in the challenged passage, he believed them to be true when he wrote them, and had no reason to doubt their truth. Therefore, he cannot be shown to have written the passage with actual malice.

### B. Cosell's Uncontested Evidence

■ In his affidavit, Cosell swears that promoter Bob Arum told him that he could not get WBC title shots for his fighters unless he gave gifts and favors to its president, Jose Sulaiman. Cosell Aff. ¶ 13.[2] In addition, Cosell's co-author, Peter Bonventre, swears in his affidavit that he, too,

heard Arum complain about having to treat Sulaiman lavishly if he wanted fighters rated or fights sanctioned by the WBC. Bonventre Aff. ¶ 12b.[3] Bonventre also recounts an incident where, while interviewing Don King, he commented that King must do a lot of favors for Sulaiman or pay him off, and King joked, without denying it, that he would write it all in a book some day. Bonventre Aff. ¶ 12f. Furthermore, Bonventre swears that he heard Bert Sugar, the former publisher of *Ring Magazine*, relate a conversation he had with Sulaiman where Sulaiman bragged about receiving expensive gifts from King. Bonventre Aff. ¶ 12a. Both Cosell and Bonventre swear in their respective affidavits that each informed the other of his experiences. Cosell Aff. ¶ 12; Bonventre Aff. ¶ 7. These pieces of evidence support Cosell's contention that, true or not, he believed that the WBC was a "conspirator in rigging ratings," an "instrument of extortion," and "easily manipulated by the gifts and favors of promoters and managers who are seeking special considerations for their fighters."[4]

---

**2.** In its brief, the WBC argues that, "it must be assumed that Cosell fabricated his claim of an admission," because he "wholly failed to identify any particular conversation or circumstance in which Arum made such a statement...." Plaintiff's Brief at 44. Even after drawing reasonable inferences in favor of the WBC, I disagree. The WBC offers no sworn testimony or other evidence contradicting Cosell's affidavit. Indeed, at his deposition, Cosell insisted again that Arum told him about the necessity of bribing Sulaiman. Plaintiff's Exh. 1 at 129. "It is not enough for the plaintiff merely to assert 'that the jury might, and legally could, disbelieve the defendant's denial ... of legal malice.'" *Contemporary Mission*, 842 F.2d at 621–22 (quoting *Liberty Lobby*, 477 U.S. at 256, 106 S.Ct. at 2514. "Some facts must be asserted to support the claim that the state of mind existed." *Markowitz v. Republic National Bank of New York*, 651 F.2d 825, 828 (2d Cir.1981).

**3.** The WBC does not dispute that Arum complained to Bonventre about having to provide special treatment to Sulaiman in order to get fights sanctioned, it merely asserts that Arum would not go on record with Bonventre about similar remarks that were later published in *Sports Illustrated*. Plaintiff's Brief at 7. Indeed, the WBC does not contest Bonventre's contention that despite refusing to discuss the comments attributed to him in *Sports Illustrated*, Arum never denied making them. *Id.*

**4.** The WBC, citing *Briggs v. Channel 4, KGBT*, 739 S.W.2d 377 (Tex.Ct.App.1987), argues that the affidavits of Cosell and Bonventre may not be considered for the purpose of adjudicating summary judgment. *See* Plaintiff's Supplemental Motion at 1. While I believe that federal law, not Texas law, controls this issue, *see generally Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252, 106 S.Ct. 2505, 2512, 91 L.Ed.2d 202 (1986); *see also supra* note 1, even Texas law would allow the consideration of the affidavits of Cosell and Bonventre on this motion. Although I find that the appeals court's decision does not stand for the proposition forwarded by the WBC, I need not discuss that case, because *Briggs* was reversed by the Texas Supreme Court, after the WBC's papers were submitted. In *Channel 4, KGBT v. Briggs*, 759 S.W.2d 939 (Tex.1988), the court held that under Rule 166a(c) of the Texas Rules of Civil Procedure, uncontroverted affidavits which are "clear [and] unambiguous" may provide the basis for summary judgment. *Id.* at 942. The affidavits of Cosell and Bonventre satisfy the requirements established by the court in *Briggs*, as well as the dictates of Rule 166a(c), which states: "A summary judgment may be based on uncontroverted testimonial evidence of an interested witness ... if the evidence is clear, positive and direct, otherwise credible and free from contradictions and inconsistencies, and could have been readily controverted." *Id.* at 941.

Although much of the information supporting Cosell's contention that he believed the remarks in the passage to be true came to him through Bonventre, the WBC offers no evidence suggesting that Cosell had any reason to doubt Bonventre's credibility. Certainly, Cosell is entitled to rely on the research and experience of his co-author, in addition to his own experience, especially when his co-author has worked with him on his television show, *Sportsbeat,* and is an award-winning journalist who has served as a writer, reporter, and editor for such well-known publications as *The New York Times, Newsweek* and *Inside Sports. Cf. Marcone v. Penthouse International Magazine for Men,* 754 F.2d 1072, 1089 (3d Cir.), *cert. denied,* 474 U.S. 864, 106 S.Ct. 182, 88 L.Ed.2d 151 (1985) (publisher may rely on the professional reputation of an author unless the "allegations are so inherently improbable that only a reckless man would have put them in circulation ... [or] there are obvious reasons to doubt the veracity ... of his reports"); *Hotchner,* 551 F.2d at 913–14 (publisher may rely on author's allegations where "the evidence does not demonstrate that [the publisher] had cause seriously to suspect that [the author's] opinions ... were without foundation").[5]

## C. Reliance On Other Publications

■ Cosell and Bonventre also claim that they relied on published articles which appeared in the *Village Voice* and *Sports Illustrated.* The WBC argues that Cosell distorted the articles in the *Village Voice* and *Sports Illustrated* to imply that the WBC was engaging in criminal acts, and seeks to introduce, as evidence of Cosell's alleged misuse of the articles, testimony by

an expert witness "in the field of media analysis and communications research." Through a complicated and confusing "scientific/statistical" method of analysis, using "codes" and "labels" and specialized terminology, the expert, Dr. Marilyn Lashner, attempts to offer her view of Cosell's subjective state of mind when he wrote the passage.

Cosell urges the Court to find that Dr. Lashner's testimony would be inadmissible under Rule 702 of the Federal Rules of Evidence. Rule 702 states: "If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise." The Rule excludes Dr. Lashner's testimony, Cosell argues, because the testimony is more confusing than probative, ultimately unhelpful to the trier of fact, and would discourage the factfinder from using his own judgment on an issue for which a factfinder is amply suited to make his own judgment.

I find Cosell's argument persuasive, and would exclude Dr. Lashner's testimony at trial on the grounds he sets forth. A layman is perfectly capable of reading Cosell's book and comparing it with the articles he claims to have relied on, without the "help" of a linguistics expert. Therefore, Dr. Lashner's testimony would waste the time of both the jury and the court. Because it transforms a common sense issue into a technical one, and relies on virtually incomprehensible pseudo-scientific jargon, Dr. Lashner's analysis must be excluded as more apt to confuse than to enlighten,

5. The WBC argues that Cosell and Bonventre "cavalierly and summarily dismissed" concerns raised by Richard H. Sugarman, who performed a pre-publication "libel reading" of the book, and Howard Cady, an editor of the book. Plaintiff's Brief at 19–20. However, the WBC concedes that, at a deposition, "[Sugarman] testified that Bonventre reassured him that the statements were true, and if anything, understatements, based on previously published reports, his own experience, and Howard Cosell's experience." Plaintiff's Brief at 20; *see also* Plaintiff's Exh. 4 at 30. Sugarman's testimony supports

Cosell's and Bonventre's contention that they always believed the truth of the assertions made in the book. Sugarman's concerns may bear on whether the *publisher* believed the comments to be true, but do not reflect on Cosell's state of mind.

Cady, the book's editor, testified at his deposition that he never spoke to either Cosell or Bonventre about the disputed passage, and that his only concern with the book was that certain early portions, relating to professional football, were repetitious. Defendant's Reply Affidavit, Exh. D at 46–47.

more unfairly prejudicial than probative. Fed.R.Evid. 403 & 702.[6]

■■ Even if Dr. Lashner's testimony were admissible, I find it insufficient to create an issue of fact as to actual malice. No reasonable reader would construe the passage the way Dr. Lashner does. Dr. Lashner states that Cosell deliberately distorted the meaning of the words and phrases borrowed from the articles in a way that converts them into criminal charges against the WBC. Irrespective of Dr. Lashner's conclusions, a reasonable reader would find that Cosell's passage and the articles say virtually the same thing about the same perceived abuses in boxing. Therefore, Dr. Lashner's testimony cannot controvert the evidence that Cosell relied on the articles.

In virtually identical language, and with much more detail, these articles, by other prominent sports journalists, make the same accusations that Cosell makes in *I Never Played the Game*. For example, correspondent Jack Newfield, in an article in the *Village Voice* entitled "The Men Who Are Killing A Noble Sport," calls the WBC both a "complicit conniver in rigging ratings," and an "instrument of extortion." Cosell Aff., Exh. C at 1 & 3. A section of another Newfield article in the *Voice*, "Don King's Boxing Monopoly," contains the heading, "Jose Sulaimain: The Regulator Who Became a Conspirator." Cosell Aff., Exh. B at 5. If anything, the book treats the WBC more gently than the articles.

In *Sports Illustrated*, Pat Putnam wrote, "[u]pon their sudden elevation, the WBC and WBA found themselves in a position to demand sanctioning fees from fight promoters, plus lavish expenses for title-fight 'observers.' Moreover, they became arrogant panhandlers, exacting tribute." Cosell Aff., Exh. E at 2. The Putnam article also quoted promoter Bob Arum, who complained, "[t]hey demanded that we wine them and dine them or we couldn't get a fight." *Id.* Newfield, too, repeatedly attacked the integrity of the WBC. In "The Men Who Are Killing A Noble Sport," he wrote, "[i]n contrast, through influence, gifts, gratuities, favors, payoffs, or whatever, stiffs from foreign lands have repeatedly been given chances to compete for world titles." Cosell Aff., Exh. C at 3. He added, "[the WBA and WBC] are both universally regarded as venal vessels easily manipulated by a few promoters and managers." *Id.* at 4. The language employed by Cosell is so similar to that used in the articles by Putnam and Newfield that Cosell's claim that he relied on them is unusually compelling.[7]

Furthermore, that various journalists throughout the sports world believe that the WBC is manipulated by gifts and favors from promoters supports Cosell's claim that he had no reason to doubt the truth of such an allegation. Cosell is permitted to rely on these articles for the same reason that he is allowed to depend on the reporting of Bonventre: the articles appeared in respected publications, and were authored by reputable journalists, whose allegations were not so improbable that a prudent author would have questioned their accuracy.

Even after "resolving ambiguities and drawing reasonable inferences against [Cosell]," *Knight v. U.S. Fire Insurance Company*, 804 F.2d 9, 11 (2d Cir.1986), *cert. denied*, 480 U.S. 932, 107 S.Ct. 1570, 94 L.Ed.2d 762 (1987), a comparison of Cosell's language with the language in the Putnam and Newfield articles reveals that there is no issue of fact as to whether Cosell embellished the charges in the articles with malicious intent.

---

6. Rule 403, Fed.R.Evid., states:
   Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence.

7. Cosell's claim that he relied on the Newfield articles is further supported by the fact that in Chapter 7, the chapter containing the statement at issue, he identifies Newfield as a "crusading reporter" who would not tolerate corruption in boxing. Cosell Aff., Exh. A at 2.

### D. Defendant's Ill–Will and Failure To Investigate

Apart from Dr. Lashner's testimony, the WBC argues that Cosell harbors ill-will towards the WBC, and that Cosell failed adequately to investigate the charges he lodged at the WBC in his book. Even conceding the truth of these factual assertions, it does not follow that Cosell knew or should have known that the allegations in his passage were false. Therefore, the WBC's contentions could not support a finding of actual malice, and a trial is unwarranted as a matter of law.

■ A factfinder may not find actual malice "on the basis of defendant's hatred, spite, ill will, or desire to injure" the plaintiff. *Letters Carriers*, 418 U.S. at 281, 94 S.Ct. at 2779–80; *accord Greenbelt*, 398 U.S. at 10, 90 S.Ct. at 1540 (impermissible for jury to "find liability merely on the basis of a combination of falsehood and general hostility"); *Rebozo v. Washington Post Co.*, 637 F.2d 375, 380 (5th Cir.), *cert. denied*, 454 U.S. 964, 102 S.Ct. 505, 70 L.Ed.2d 379 (1981) ("Recklessness cannot be inferred, however, from the mere combination of falsehood and the defendant's general hostility toward the plaintiff. . . .").

Standing alone, a defendant's failure to conduct an investigation before publishing his piece is also insufficient proof of actual malice. *See St. Amant v. Thompson*, 390 U.S. 727, 733, 88 S.Ct. 1323, 1326, 20 L.Ed. 2d 262 (1968) ("Failure to investigate does not in itself establish bad faith."); *Herbert*, 781 F.2d at 308, *quoted in Contemporary Mission*, 842 F.2d at 621 ("[A] finding of actual malice cannot be predicated merely on a charge that a reasonable publisher would have further investigated before publishing. . . ."). The WBC argues that a failure to investigate may be considered in determining actual malice where the situation does not involve the time pressure attendant on immediately reporting "hot news" items. Whether or not Cosell's book can be characterized as a fast-breaking "hot news" item, I am unable to find support for the WBC's proposition.

The principal case relied on by the WBC, *Curtis Publishing Co. v. Butts*, 388 U.S. 130, 87 S.Ct. 1975, 18 L.Ed.2d 1094 (1966), allowed a jury to consider a magazine's failure to investigate only after determining that "the editors of the magazine recognized the need for a thorough investigation of the serious charges." *Id.* at 157, 87 S.Ct. at 1992. The Court allowed the jury to consider the magazine's failure to investigate because the source of defendant's information "had been placed on probation in connection with bad check charges," and was therefore deemed unreliable in the absence of outside support. *Id.* The Court never held that a failure to investigate may establish bad faith where the situation did not involve "hot news."

Similarly, the WBC's reliance on *Golden Bear Distribution Systems v. Chase Revel, Inc.*, 708 F.2d 944, 950 (5th Cir.1983), is misplaced. In that case, the court noted that the defendant had sufficient time to investigate the activities of the plaintiff, but only after discussing several other grounds supporting the jury's finding that the defendant published its article with reckless disregard for the truth. *Id.* The evidence adduced at trial showed that both the author and the editor of the article possessed a variety of information indicating that plaintiff was not involved in the fraud detailed in the magazine column. *Id.* In addition, the defendant refused to print a retraction, despite having been contacted by the plaintiff, which offered to prove it was innocent of any wrongdoing. *Id.* The defendant's failure to investigate was significant only because the defendant was aware of the substantial likelihood that the plaintiff was not involved in the investment fraud described in the article. In sum, there is no rule that an author must conduct an investigation absent a showing that he had reason to doubt the veracity of his sources, or possessed other information leading him to question the truth of his assertion.

The law is clear that standing alone, neither a defendant's ill-will toward the subject of a derogatory statement, nor a defendant's failure to investigate a defamatory assertion, can establish actual malice. In the absence of precedent, I decline plain-

tiff's invitation to promulgate a new rule that an author's ill-will toward his subject, combined with a failure to investigate the sources of his information, is enough to establish actual malice, especially where, as here, defendant relied on articles written by investigative journalists in reputable publications, and the WBC provides no evidence suggesting that Cosell's allegations are "so inherently improbable that only a reckless man would have put them in circulation," or, that "there are obvious reasons to doubt the veracity" of his sources. *St. Amant,* 390 U.S. at 732, 88 S.Ct. at 1326.

### E. Evidence Of A Subsequent Remedial Change

Lastly, the WBC purports to prove actual malice on Cosell's part by pointing out that the language in the contested passage was altered in a subsequent paperback edition of the book. The WBC argues that, because the language in the paperback edition was modified, Cosell must have known that he lacked support for the passage when he wrote the original hardcover edition.

■ However, evidence of a subsequent change in an allegedly libelous text is inadmissible for the purpose of proving actual malice. Rule 407 of the Federal Rules of Evidence specifically provides:

> When, after an event, measures are taken which, if taken previously, would have made the event less likely to occur, evidence of the subsequent measures is not admissible to prove negligence or culpable conduct in connection with the event.

The primary ground underlying this rule is a social policy of "encouraging people to take, or at least not discouraging them from taking, steps in furtherance of added safety." Fed.R.Evid. 407 advisory committee's note. Courts have applied the broad language of this rule "to exclude evidence of subsequent repairs, installation of safety devices, changes in company rules, and discharge of employees." *Id.* The principle applies in a libel case as well, because the elimination of defamatory language in a subsequent edition limits the extent of the damage to an individual's reputation, by keeping injurious material from the eyes of new readers.

■ Consistent with this policy, evidence of a subsequent remedial measure is admissible against a defendant if the measure was taken by someone who is not a party to the lawsuit, since admission of the evidence against the defendant would not deter a non-party from taking remedial action. *Koonce v. Quaker Safety Products & Mfg. Co.,* 798 F.2d 700, 719–20 (5th Cir. 1986); *Dixon v. International Harvester Co.,* 754 F.2d 573, 583 (5th Cir.1985); *Farner v. Paccar, Inc.,* 562 F.2d 518, 528 n. 20 (8th Cir.1977). Thus, in certain cases, it may be crucial to determine who instituted the remedial change.

In the case at bar, however, it is not important whether Cosell or the non-party publisher was actually responsible for the modification of the paperback edition of *I Never Played the Game.* Regardless of who altered the text, the subsequent modification does not raise an issue of fact about whether Cosell originally wrote the disputed passage with actual malice. If Cosell altered the text, evidence concerning this act is barred by Rule 407. And if the publisher altered the text, then the subsequent modification is irrelevant, because no inference can be drawn about what Cosell knew or should have known at the time he wrote the hardcover edition based on actions taken by another at a later date with respect to the paperback edition. Overall, none of the grounds asserted by the WBC could support a finding that Cosell wrote the passage in question with actual malice.

### F. Further Discovery

In its brief, the WBC asserts that it is currently seeking information from Cosell concerning the identity of alleged confidential sources, tape recordings of conversations between Cosell and Bonventre relating to the book, and the original manuscript of the book. Plaintiff's Brief at 27. However, according to counsel for both sides, all of these discovery issues were resolved by the parties subsequent to the filing of plaintiff's brief.

The issue of Cosell's confidential sources was settled by the Court and the parties, in a stipulation, with Cosell agreeing not to rely on any information derived from unnamed sources. With respect to the audiotapes and the manuscript, counsel for both the WBC and Cosell have represented to the Court that all discoverable materials have been provided to plaintiff. This basis for opposing summary judgment is therefore moot.

## CONCLUSION

Acting as the third man in the ring, the Court rules that low or not, Cosell's blow was struck in good faith, and raises his arm in victory.

For the reasons set forth above, Cosell's motion for summary judgment is granted, and the case is dismissed.

SO ORDERED.